**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MATTHEW VEAL, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LENDINGCLUB CORPORATION, SCOTT SANBORN, CARRIE L. DOLAN, BRADLEY COLEMAN, and THOMAS W. CASEY,<br><br>Defendants. | **Case No: 5:18-cv-2599-BLF**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs XiangHong Ding and Zhenbin Chen ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for Plaintiffs' consolidated amended complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LendingClub Corporation ("LendingClub" or "Company"), analysts' reports and advisories about the Company, information provided by the Federal Trade Commission ("FTC") Complaint, interviews with former employees of LendingClub ("Confidential Witnesses" or "CWs"), and information readily obtainable on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of LendingClub Corporation between May 9, 2016 and April 25, 2018 after the public

disclosure of the FTC Complaint, both dates inclusive ("Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. In May of 2016, LendingClub was hit with a scandal involving senior LendingClub officers' purposely deceiving an institutional investor by manipulating application dates to create the false appearance that loans conformed to that investor's express direction. In response, the Company terminated senior executives, announced the "resignation" of its founder and CEO, and disclosed Department of Justice ("DOJ") and SEC investigations into the allegations underlying loan doctoring scandal.

3. The investor scandal damaged LendingClub's reputation with its lenders. The Company had marketed itself, through its marketing chief and newly elevated CEO, Defendant Scott Sanborn, so as "to attract borrowers and investors and build brand awareness and reputation," which were essential drivers of the Company's "continued organic growth in [its] investor and borrower base," and material to its "success and future growth."

4. In the wake of the investor scandal, LendingClub, which was just one player in a highly competitive market, could ill afford any additional negative disclosures, especially allegations of deception. Acknowledging this, the Company stated that "[i]n the five business days since the announcement of the internal board review described below, the Company has been actively exploring ways to restore investor confidence in its platform and obtain additional investment capital for the platform."

5. Nevertheless, concurrently and well after Defendants had deceived investors, the Company was also knowingly or recklessly deceiving borrowers. By the beginning of the Class Period, in violation of Federal Trade Commission ("FTC") regulations, Defendants lured borrowers to the LendingClub platform through deceptive practices with respect to loan applications, processing, and approval.

6. LendingClub is an "online marketplace connecting borrowers and investors," which the Company claims will "increase efficiency, reduce manual processes, and improve the overall borrower and investor experience." For *consumers*, *i.e.*, borrowers, LendingClub stated that "the range of loan products we facilitate are simple, fair and responsible credit products that make it easier for consumers to budget for monthly repayment and meet their financial goals." For *investors*, the Company offered the ability "to earn attractive risk-adjusted returns from an asset class that has generally been closed to many investors and only available on a limited basis to large institutional investors."

7. During the Class Period, LendingClub lured prospective borrowers by promising "no hidden fees." When the Company deposited loan funds into borrowers' bank accounts, however, the funds were hundreds or even thousands of dollars short of what borrowers believed that they had contracted for. Directly contrary to its representations and marketing materials, the Company withheld from each loan a hidden, up-front fee, referred to as an origination fee, that LendingClub deducted from borrowers' loan proceeds. Defendants knowingly or recklessly engaged in this deceitful conduct despite LendingClub's own compliance department's warning that concealing the up-front fee is "likely to mislead the consumer."

8. Indeed, internal compliance reviews repeatedly cite the concealment of the up-front or origination fee as a significant problem for consumers. One compliance review noted that while a borrower may find reference to the fees buried several clicks into the Company's "tooltip" page, the up-front fee was "not readily apparent." "This omission," the compliance review cautioned, "could be perceived as deceptive as it is likely to mislead the consumer." Similarly, according to the FTC, one of LendingClub's largest investors warned Defendants that the up-front fee "is not clear and conspicuous and could be subject to a UDAAP claim."[1] That investor's legal counsel also told Defendants that the Company's ads "prominently state[] that there are 'No Hidden Fees' yet the documents we reviewed contain a large ($300 to $450) origination fee that only appears once," and

[1] UDAAP is Unfair, Deceptive and Abusive Acts or Practices.

warned this "relative obscurity" could make it a target in a law enforcement action. Defendants ignored these warnings.

9. The hidden-fee Defendants knowingly or recklessly caused the Company to charge borrowers both before and during the Class Period was not the Company's only deceptive conduct. LendingClub also misleadingly told investors prematurely that their loans were approved, and without informing borrowers, the Company improperly withdrew funds from customer accounts without approval, practices which further violate FTC regulations. Further, in violation of the Gramm-Leach-Blily Act, the Company failed to provide consumers with clear and conspicuous privacy notices.

10. Defendants knew or recklessly disregarded that, before and during the Class Period, borrowers and Company insiders raised red flags regarding the Company's practices. A material number of customers called the Company to complain about the hidden fees, and LendingClub employees made similar complaints to their supervisors. Supervisors routinely instructed representatives who interacted directly with borrowers not to discuss the hidden origination fee during the loan origination process unless a borrower brought it up to them.

11. Defendants knew or recklessly disregarded that continuing to turn a blind eye and mislead investors regarding the Company's hidden fees and other deceptive conduct risked further harm to the Company's reputation and, in turn, its ability to attract investors and borrowers, while also subjecting LendingClub to heightened FTC scrutiny.

12. After the market opened on April 25, 2018, the FTC issued a press release, disclosing that it had filed a complaint against LendingClub, alleging with specificity the Company's deceptive practices.[2] The news of yet another reputational hit, involving particularized allegations of deceit, shocked the market. In intra-day trading, shares of LendingClub fell $0.49 per

[2] Attached hereto as Exhibit A and incorporated herein by reference in its entirety is the FTC's April 25, 2018 Complaint, *Federal Trade Comm'n v. LendingClub Corp.*, Case 3:18-cv-02454-JSC (N.D. Cal.). Attached hereto as Exhibit B and incorporated herein by reference in its entirety is the FTC's October 22, 2018 First Amended Complaint.

share or over 15% from its previous day's closing price to close on April 25, 2018 at $2.77 per share on relatively enormous volume of over 18.8 million shares traded. Analysts were concerned that another hit to LendingClub's reputation required a lower valuation as investors and borrowers sought out alternatives to the Company's platform.

13. As a result of the disclosure or materialization of the risk of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

16. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and the Company is headquartered in this Judicial District.

17. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18. Plaintiff XiangHong Ding purchased LendingClub securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures and/or materialization of the undisclosed risks.

19. Plaintiff Zhenbin Chen purchased LendingClub securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures and/or materialization of the undisclosed risks.

20. Defendant LendingClub operates an online marketplace platform that connects borrowers and investors in the United States. The Company is incorporated in Delaware and its principal executive offices are located at 71 Stevenson St., Suite 300, San Francisco, California 94105. LendingClub's securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "LC."

21. Defendant Scott Sanborn ("Sanborn") was the Company's Acting CEO from May 6, 2016 until June 28, 2016. Sanborn has been the Company's CEO since June 28, 2016. Prior to becoming CEO, Sanborn acted as President of LendingClub beginning in April 2016. Before becoming President, Sanborn was the Company's Chief Operating Officer and Chief Marketing Officer. As Chief Marketing Officer, Sanborn oversaw the Company's marketing efforts "to attract and retain borrowers and investors and build brand awareness and reputation." Before and during the Class Period, the Company "dedicate[d] significant resources to [its] marketing and brand advertising efforts and strategic relationships" of which Sanborn had detailed knowledge first as Chief Marketing Officer and then as CEO. Sanborn directed the Company's "use [of a] diverse array of marketing channels and" its constant efforts "to improve and optimize [its] experience both on- and offline to achieve efficiency and a high level of borrower and investor satisfaction." Before the Class Period, Sanborn was aware of the Company's disclosure of its belief that "reputation, word of mouth and [its] direct marketing via mail drives continued organic growth in [its] investor and borrower base."

22. Defendant Carrie L. Dolan ("Dolan") served as the Company's Chief Financial Officer ("CFO") from August 16, 2010 to August 8, 2016.

23. Defendant Bradley Coleman ("Coleman") served as the Company's Principal Accounting Officer, and served as the Company's Interim-CFO from August 2016 to September 2016.

24. Defendant Thomas W. Casey ("Casey") has been the Company's CFO since September 19, 2016.

25. Defendants Sanborn, Dolan, Coleman and Casey are sometimes referred to herein as the "Individual Defendants."

26. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

27. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**<u>SUBSTANTIVE ALLEGATIONS</u>**

**BACKGROUND**

28. LendingClub purports to operate as an online marketplace that "matches" borrowers and investors. LendingClub facilitates various types of loan products for consumers and small businesses, including unsecured personal loans, consumer loans, unsecured education and patient finance loans, and unsecured small business loans. The Company also offers investors (*i.e.*, "lenders") an opportunity to invest in loans based on term and credit characteristics.

29. Based on LendingClub's representations concerning its transparency, marketplace neutrality, and lack of credit risk, LendingClub raised over $1 billion from investors in its December 11, 2014 IPO, selling 66.7 million shares at $15 each, and its stock price climbed to almost $28 per share following the IPO.

**Prior Deceptive Conduct and Lack of Internal Controls**

30. In May, 2016, LendingClub disclosed that it had engaged in material deceptive conduct involving senior executives and managers knowingly misleading investors as to the characteristics of certain loans. The Company stated that "material weaknesses in internal control over financial reporting" had manifested in undisclosed self-dealing, sales of non-conforming loans, backdated loan applications, and such a damaged reputation, that after years of proclaiming itself to be a neutral market maker that was not taking on credit risk, LendingClub openly acknowledged that it had become its own best prospect for new business. At the center of this wrongdoing was Renaud Laplanche, LendingClub's founder, Chairman, and CEO, as well as multiple "senior managers," all of whom were terminated or forced to resign.

31. As a direct result of this reputation hit, analysts downgraded the Company's stock based materially on its lack of critical internal controls. For example, analyst Eric Wasserstrom of Guggenheim issued an analyst report on May 12, 2016 stating:

> Our downgrade was consistent with our view that marketplace lending companies need to demonstrate strength in the four pillars that are critical to the success of any lending company: dynamic and defensible underwriting; strong credit risk management capabilities; a durable undoing structure; and *a culture of regulatory compliance*. While we believe that 1Q results demonstrated that LC is well positioned on the first three of these criteria, the disclosure of a series of control failures underscored its need to improve its oversight and compliance related to internal control issues. (Emphasis added).

32. Going forward, Defendants knew that the market needed to be assured of the quality of the Company's internal controls and the integrity of its business practices, especially given the decline in the stock price that the revelation of the Company's previous wrongdoing had caused. In the quarterly report on Form 10-Q that Defendants caused the Company to file with the SEC on

May 16, 2016, Defendants stated, "[i]n the five business days since the announcement of the internal board review described below, the Company has been actively exploring ways to restore investor confidence in its platform and obtain additional investment capital for the platform."

33. The market and analysts were extremely focused on the Company's regulatory issues going forward. For example, analyst Eric Wasserstrom from Guggenheim issued a report on May 12, 2016 stating, "Our downgrade was consistent with our view that marketplace lending companies need to demonstrate strength in the four pillars that are critical to the success of any lending company: dynamic and defensible underwriting; strong credit risk management capabilities; a durable funding structure; ***and a culture of regulatory compliance***. While we believe that 1Q results demonstrated that LC is well positioned on the first three of these criteria, the disclosure of a series of control failures underscored its need to improve its oversight and compliance related to internal control issues."

34. Later in the Class Period, Wasserstrom issued another analyst report on November 7, 2016 reiterating his view of the four pillars of success, and stating that "the actions management has taken in response to its prior control failures suggest to us that it is improving its compliance culture."

35. Despite the Company's false statements regarding its regulatory compliance and deceptive conduct, as discussed below, analysts, viewed the Company's efforts to improve its controls and reputation increasingly positively in 2017 and into 2018, issuing buy recommendations and believing the Company was getting back on track. Analysts from Guggenheim issued several analyst reports during this timeframe, reiterating buy rating, and on February 21, 2018 after the Company's settlement of their Class Action law suit related to its previous internal control issues, stated that it believed the troubles were behind the Company. Jeff Cantwell of Guggenheim similarly maintained his buy rating on August 7, 2017.

**LendingClub's Borrowing Platform**

36. LendingClub's borrowers apply for loans through the Company's website. LendingClub reviews the applicant's creditworthiness, and matches the borrower with a lender or

lenders to fund entire loans, portions of individual loans, and/or portions of pools of loans. In order to avoid state banking regulations, LendingClub uses its primary issuing bank partner, WebBank, which simultaneously originates each loan and sells it to LendingClub (at a price that includes modest fees and interest). LendingClub buys these loans with the money from its "matched" lenders, and services the loans. For its role, LendingClub receives an initial origination fee and subsequent servicing fees on each payment throughout the term of the loan.

37. Because LendingClub makes most of its money from origination and servicing fees (on loans it originates), it repeatedly emphasized the importance of loan originations to its financial results, stating:

> We believe originations are a key indicator of the adoption rate of our marketplace, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction rates, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.

38. LendingClub described its marketplace as one in which (1) customers borrow to lower the cost of their credit and enjoy a "better experience" than traditional bank lending; and (2) "lenders" earn attractive risk-adjusted returns from an asset class that has generally been closed to individuals and is available to institutional investors on only a limited basis.

39. LendingClub also emphasized that one of its competitive advantages was its transparency of reporting. The Company's 2016 and 2017 10-K's filed with the SEC during the Class Period stated:

> ***Transparency and Fairness.*** The installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty. (Emphasis in original).

**Hidden Fees**

40. During the Class Period, many borrowers learned of LendingClub's products through its advertisements. In those advertisements, both in writing and online, Defendant often represented that the Company charged "no hidden fees."

41. Although it actively promoted to borrowers that it charged "no hidden fees," Defendants knew or recklessly disregarded that LendingClub charged consumers an up-front fee that was not clearly and conspicuously disclosed, burying reference to the fee multiple clicks into the Company's website. The Company calculated this hidden fee as a percentage of the requested loan amount -- on average, approximately 5%. The fee often exceeded one thousand dollars.

42. During the Class Period, LendingClub deducted the hidden, up-front fee from the "Loan Amount" before disbursing the loan funds to the borrower. As a result, in most cases, borrowers received materially less loan proceeds than they believed they had contracted. More, borrowers paid interest on the entire "Loan Amount," ***including the fee*** – principal that they never received.

43. CW1 worked as a member support representative at LendingClub from March 2016 to March 2018 in the Company's main office in San Francisco, and reported to the Operations Supervisor, who in turn reported to the Member Support Manager CW1 confirmed that LendingClub misrepresented the existence of the origination fees in communications with consumers and stated that for online applicants, the only place the one-time fee was mentioned was far down the page and in very small print.

44. CW1 also stated that the Company routinely trained and managed its support representatives to ensure consumer confusion. For example, CW1 stated that the Company timed each support call, and managers directed support representatives to devote no more than four minutes and thirty seconds to each call, an insufficient time to answer potential borrowers' questions about the loan process. CW1 further stated that the Company's management knew that support representatives were not adequately informing consumers about the loan process and hidden fees. CW1 stated that representatives never explicitly let consumers know about the origination fee

– it was up to the consumers to find and read it. Further, management instructed representatives not to read truth-in-lending disclosures to consumers.

45. CW1 further stated that the Company's managers, including CW1's direct supervisors and Company executives, including Defendant Sanborn, were aware of the confusion consumers faced due to LendingClub's misleading statements. CW1 stated that given the general awareness within the Company of the hidden fee problem and Sanborn's hands-on management style, Sanborn and other top management were aware that the Company was misleading potential borrowers about the hidden origination fees.

46. Borrowers frequently complained to Defendants throughout the Class Period that they were not aware of the origination fee that the Company deducted from the full "Loan Amount." In many cases, the Company's deducting of the origination fee caused the loan amount received to be insufficient to accomplish the purpose of the loan, *e.g.*, paying off a certain debt or covering certain large living expenses.

47. In fact, during the Class Period, many potential borrowers did not know that LendingClub would deduct an up-front fee from their loan proceeds. Borrowers frequently complained that they only discovered the origination fee *after* LendingClub disbursed their loan proceeds, when they noticed that the amounts disbursed were smaller than for which they believed they had contracted. At least tens of thousands of consumers contacted the Company after receiving funds to ask about the up-front fee or to ask why they did not receive the full loan amount. Many consumers who have complained that they were unaware of the up-front fee attempted to cancel their loans once they learned of the fee, preferring a loan from a competitor or no loan at all.

48. During the Class Period, Defendants knew or recklessly disregarded that many potential borrowers were unaware of the origination fee and expected to receive the full loan amount. Defendants' own customer service representative training materials list as one of the two most frequent post-loan disbursement complaints as "I didn't receive the full loan amount."

49. Defendant's quarterly complaint reviews proposed "highlighting [the] origination fee" to address complaint volumes.

50. CW2 worked as a senior credit specialist at LendingClub in the San Francisco office from August 2014 to September 2016. CW2 spent the first few at LendingClub working as a member support representative before becoming a credit specialist. CW2 confirmed that the Company received numerous consumer complaints about the origination fees and participated in regular meetings with Senior Vice President of Operations Darin Cline, in which member support staff voiced concerns about the constant stream of calls from borrowers expressing confusion after receiving loan proceeds less than they expected.

51. CW3 worked as a member support representative at LendingClub from July 2015 to August 2016, and thereafter as a payment processing specialist from September 2016 to September 2017 based at the Company's main office in San Francisco, CA. CW3 confirmed the material number of borrower complaints about the hidden origination fee. As part of the member support team, CW3 took about 200 calls each day from borrowers, approximately one quarter to one third of those calls from borrowers upset after receiving materially less loan proceeds than they expected. Many of those borrowers expressed feeling cheated because the Company had claimed they did not charge fees, or told them they would receive an amount that differed from what they had ultimately received.

52. CW3 also reported that many borrowers attempted to return the money they had borrowed to LendingClub, and that many were unable to because they had called after their grace period had expired. Borrowers frequently claimed the Company had told them the loan would be "free" and that no fees would be taken off the top. The disclosure letter that borrowers were shown after pre-approval, as they entered the application process, featured the fee disclosure language farther down the form and in several sizes smaller type than the other information. Many borrowers failed to notice the language because they had been assured there were no hidden fees, and, therefore, were not analyzing the disclosures as closely as they otherwise would have.

53. CW3 reported that borrowers were upset because the "free loan" language in LendingClub's promotional materials led those borrowers to believe that LendingClub would not take any fees out of the loan amount for which they had been approved.

54. CW3 also confirmed that management trained member support representatives specifically to deal with consumers upset about the hidden origination fee. Specifically, the Company trained all member support representatives to direct borrowers to where the Company had disclosed the origination fee during the loan process. The Company trained member support representatives to scroll through large documents with complaining borrowers, showing several lines in far smaller type that summarized the origination fee.

55. CW3 stressed how difficult it was for borrowers to notice the fee disclosure during the loan origination process. CW3 noted the placement of the disclosure of the origination fee and the very small print in which it appeared, much smaller than the amount financed and the amount received.

**Loans Promised**

56. In addition to misrepresenting to consumers the existence of the hidden origination fee, LendingClub affirmatively deceived potential borrowers throughout the loan origination process by various means.

57. Although the Company told each consumer who completed a personal loan application that his or her "loan is on the way," this misrepresented the actual loan process. In reality, to receive final approval a potential borrower's application must undergo two additional processes after completion. First, an application must attract sufficient investor backing, and second, an application must pass LendingClub's stringent "back-end" credit review -- so called to distinguish it from the less stringent, "front-end" review that LendingClub conducts while the potential borrower's application was still in progress.

58. In cases where a consumer had garnered investor funding (but before LendingClub had finished the "back-end" review), LendingClub frequently represented that the consumers would

receive loans. For example, LendingClub sent approximately 196,000 consumers an email the subject line of which reads "Hooray! Investors Have Backed Your Loan." The body of the email begins, in large, bold print, "Your Loan is 100% Backed," and continues: "Great news! Investors have backed your loan 100%. Your money is almost in your hands. You can always visit your Account Summary to view the details of your loan. Welcome to LendingClub! All the best, LendingClub." Upon receiving emails such as these and similar representations, many potential borrowers believed that their loans had been approved, and that they would soon receive the sum they had agreed to.

59. In reality, however, many consumers who received such representations were subsequently rejected based on the Company's "back-end" credit review and never received a loan from LendingClub. For example, of the approximately 196,000 consumers who received the above email, the Company rejected at least 43,000 or 22%. The "back-end" credit review is comprehensive and often involves, *inter alia*, an additional credit inquiry, a phone call to the potential borrower, requests for additional documentation, and a detailed review of the potential borrower’s tax and bank records.

60. LendingClub frequently issued back-end denials even to potential borrowers who provided the requested documents, and whose applications were truthful, based upon LendingClub’s further evaluation of the potential borrower. LendingClub also issued back-end denials to consumers based on its own errors. For example, the Company acknowledged incorrectly denying one consumer’s application on the ground that her mailing address and residential address did not match when, in fact, the consumer lived at a “rural route” address, meaning that she received mail at a post office box rather than her physical address.

61. Defendants were aware that their representations to potential borrowers were misleading. The Company’s training materials list "What does that mean? I thought I was approved" as a frequently asked question that customer service representatives should expect to hear.

62. In addition, LendingClub received numerous complaints from potential borrowers whom LendingClub rejected after leading them to believe that it had approved their loans, including some who did not seek other credit or turned down offers from LendingClub's competitors because they believed that they had already obtained a loan from LendingClub.

**Defendant's Unauthorized Bank Account Withdrawals**

63. During the Class Period, the Company's default method of collecting borrowers' scheduled monthly payments was automatic electronic bank account withdrawal *via* ACH (Automated Clearing House) transfer. In numerous instances during the Class Period, LendingClub withdrew money from borrowers' bank accounts without authorization, or in amounts in excess of the amount borrowers had authorized.

64. The Company frequently charged borrowers double payments without authorization, improperly withdrawing borrowers' monthly payments twice in one month. In numerous other instances, LendingClub automatically withdrew monthly payments from borrowers' accounts even after borrowers had repaid their loans, *in full*. When borrowers asked that LendingClub stop automatic withdrawals because they wished to pay by check or use a different bank account, LendingClub frequently disregarded those requests and continued automatic withdrawal.

65. According to the FTC, during the Class Period borrowers reported to their banks that LendingClub made at least 3,850 unauthorized withdrawals, a rate materially worse than many of the nation's largest loan servicers. Hundreds of borrowers also contacted the Company to complain about its unauthorized withdrawals. Most consumers only learned of the unauthorized charges by checking their bank statements, or by learning that their accounts were overdrawn.

66. According to the FTC, the unauthorized withdrawals have been a persistent issue over time. In at least twenty-one of the last twenty-four months, Defendant has made more than one hundred withdrawals that consumers have reported to their banks as unauthorized, and in six of those months, Defendant has made more than two hundred such withdrawals. These numbers are

comparable to or worse than those of three of the nation's largest loan servicers, even though those companies service three to four times as many loans as LendingClub does.

67. According to the FTC, Defendants knew or recklessly disregarded the prevalence of these practices. The Company's monthly complaint reporting reflected a growing number of complaints about the payoff process and about payment processing more generally. In addition, Defendant's own payments department self-reported increasing numbers of such transactions.

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

68. The Class Period begins on May 9, 2016. On that date, LendingClub issued a press release entitled "LendingClub Reports First Quarter 2016 Results; Chairman & CEO Renaud Laplanche Resigns," filing it with the SEC as Exhibit 99.1 to a Form 8-K ("May 9, 2016 Press Release"). Defendant Dolan signed the Form 8-K. In the press release, Defendant Sanborn acknowledged that Laplanche's actions, which led to his forced resignation, were "a violation of the Company's business practices" and "unacceptable to the board," and stated that "[a] key principle of the Company is maintaining the highest levels of trust with borrowers, investors, regulators, stockholders and employees."

69. The foregoing statement concerning maintaining trust with borrowers and regulators was materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub engaged in systemic, material deceit on potential borrowers, belying their claim that maintaining trust with potential borrowers and borrowers was a "key principle." Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6)

consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

70. In the May 9, 2016 Press Release, Defendants referred to and incorporated by reference therein the Company's "Risk Factors" from its Annual Report on Form 10-K for the year ended December 31, 2015, filed with the SEC on February 22, 2016 ("2015 10-K"). LendingClub issued similar press releases concerning its results on August 8, 2016 ("August 8, 2016 Press Release") and November 7, 2016 ("November 7, 2016 Press Release"), filing it with the SEC as Exhibit 99.1 to Forms 8-K and incorporating by reference therein the Company's Risk Factors from the 2015 10-K. On May 9, 2016, August 8, 2016, and November 7, 2016, respectively, LendingClub held Earnings Conference Calls, incorporating by reference the Company's Risk Factors from the 2015 10-K.

71. Later on May 9, 2016, the Company held its First Quarter of 2016 Earnings Conference Call ("Q1 2016 Earnings Call"). During a discussion of $22 million in near-prime loans that violated the Company's business practices, LendingClub's Executive Chairman John C. Morris ("Morris") stated on behalf of the Company that "a key principle of the company is maintaining the highest level of trust with ***borrowers, investors, regulators, stock holders,*** all our employees." (Emphasis added). Morris further stated on behalf of the Company that "[a] violation of the company's business practices … was unacceptable to the board. And this is not something the board will compromise on in anyway."

72. The foregoing statement concerning maintaining trust with borrowers and regulators was materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub engaged in systemic, material deceit on potential borrowers, belying their claim that maintaining trust with potential borrowers and borrowers was a "key principle." Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact,

applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

73. Also during the Q1 2016 Earnings Call, Defendant Sanborn stated that, in the wake of Laplanche and other former senior executives' deceit and misconduct, "[o]ur priority is to reaffirm our commitment to trust, compliance and risk management that have been so essential in the success of our online marketplace."

74. The foregoing statement concerning the Company's commitment to trust and compliance was materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub engaged in systemic, material deceit on potential borrowers, belying their claim that maintaining trust with potential borrowers and borrowers was a "key principle." Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

75. On May 16, 2016, August 9, 2016, and November 9, 2016, respectively, the Company issued Quarterly Reports on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarters ending March 31, 2016 ("1Q 2016 10-Q)"), June 30, 2016 ("2Q 2016 10-Q"), and September 30, 2016 ("3Q 2016 10-Q"), and referring to and incorporating by reference therein, the Company's risk disclosures from the 2015 10-K.

76. In the 2015 10-K, the Company disclosed the following:

> ***The collection, processing, storage, use and disclosure of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights.***
>
> . . . Our failure to comply with applicable privacy policies or federal, state or foreign laws and regulations or any compromise of security that results in the unauthorized release of personally identifiable information or other user data could damage our reputation, discourage potential borrowers or investors from using our marketplace or result in fines or proceedings brought against us, our issuing banks or other third parties by governmental agencies, borrowers, investors or other third parties, one or all of which could adversely affect our business, financial condition and results of operations. . . . Any inability to adequately address privacy concerns, even if unfounded, or to comply with applicable privacy or data protection laws, regulations and privacy standards, could result in additional cost and liability for us, damage our reputation, inhibit use of our marketplace and harm our business.

77. The foregoing Risk Factors from the 2015 10-K that Defendants incorporated by reference in their various public filings, earnings calls, and press releases during 2016, concerning the Company's compliance with laws and regulations concerning privacy were false and misleading because Defendants failed to disclose that LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act and, therefore, that the risks discussed with respect to its failure to comply with such regulations had already materialized.

78. The Company further warned in the 2015 10-K Risk Factors that the Company could run afoul of borrower protection and federal and state consumer protection laws, stating:

> ***We and our issuing bank partners are subject to borrower protection laws and federal and state consumer protection laws.***
>
> We and our issuing bank partners must comply with regulatory regimes, including those applicable to consumer credit transactions, various aspects of which are untested as applied to our marketplace. Certain state laws generally regulate interest rates and other charges and require certain disclosures. In addition, other federal and state laws may apply to the origination and servicing of loans facilitated

> through our marketplace. ***In particular, through our marketplace, we may be subject to laws, such as:***
>
> ***
>
> • ***Section 5 of the Federal Trade Commission Act, which prohibits unfair and deceptive acts or practices in or affecting commerce, and Section 1031 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which prohibits unfair, deceptive or abusive acts or practices in connection with any consumer financial product or service***;
>
> ***
>
> • ***the Gramm-Leach-Bliley Act, which includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information, and other privacy laws and regulations;***
>
> ***We may not always have been, and may not always be, in compliance with these laws. Compliance with these laws is also costly, time-consuming and limits our operational flexibility.***
>
> Failure to comply with these laws and regulatory requirements applicable to our business may, among other things, limit our or a collection agency's ability to collect all or part of the principal of or interest on loans. As a result, we may not be able to collect our servicing fee with respect to the uncollected principal or interest, and investors may be discouraged from investing in loans. In addition, non-compliance could subject us to damages, revocation of required licenses, class action lawsuits, administrative enforcement actions, rescission rights held by investors in securities offerings and civil and criminal liability, which may harm our business and our ability to maintain our marketplace and may result in borrowers rescinding their loans.

79. The foregoing Risk Factors from the 2015 10-K that Defendants incorporated by reference in their various public filings, earnings calls, and press releases during 2016, concerning LendingClub's compliance with borrower protection and federal and state consumer protection laws

were false and misleading because Defendants failed to disclose that LendingClub was engaged in systemic, material deceit on potential borrowers. Specifically, Defendants were duty bound to disclose, but failed to disclose that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action; and therefore, the risks warned of in the 2015 10-K with respect to the Company's compliance with borrower protection and federal and state consumer protection laws had already materialized.

80. The Company filed with the SEC the Q1 2016 10-Q on May 16, 2016. Defendants Sanborn and Dolan signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

81. Defendants Sanborn and Coleman signed an identical certification in connection with the 2Q 2016 10-Q, filed with the SEC on August 9, 2016, and Defendants Sanborn and Casey signed an identical certification in connection with the 3Q 2016 10-Q, filed with the SEC on November 9, 2016.

82. The foregoing statements concerning the operations of the Company contained in the certifications Defendants signed in connection with the Company's quarterly reports were materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub engaged in systemic, material deceit on potential borrowers, belying their claim that maintaining trust with potential borrowers and borrowers was a "key principle." Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they

would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

83. On August 8, 2016, the Company held its Second Quarter of 2016 Earnings Conference Call ("Q2 2016 Earnings Call"), during which Defendant Sanborn stated, in pertinent part:

> I'd like to spend a minute giving you an update on our controls. Our long-term success is dependent on coupling our technology and business model advantages with ***a relentless focus on compliance, security and risk management***. Since May 9, we have initiated a comprehensive review of our controls, compliance and governance. As I highlighted at our annual meeting, ***we've made a number of improvements***.
>
> We're incorporating best practice recommendations from KPMG and our third-party consultants into our processes. We're bolstering resources dedicated to compliance in over site activities. We're evaluating how to best align business and control functions to provide a better risk management structure. We have increased training requirements on data change management and are enhancing our end-to-end testing framework. ***And we're retraining employees on both conduct and FX, and reinforcing the importance of a high compliance culture***. Beyond our internal focus, we remain proactive with regulators, policy makers and consumer advocacy groups. (Emphasis added).

84. The foregoing statements concerning the Company's focus on compliance above were materially false and/or misleading because Defendants knew or recklessly disregarded that their discussing the Company's improved compliance imposed on them a duty to disclose that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the

Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

85. On November 7, 2016, the Company held its Third Quarter of 2016 Earnings Conference Call ("Q3 2016 Earnings Call"). During the Q3 2016 Earnings Call, Defendant Sanborn stated as follows with in regard to LendingClub's auto refinance product:

> Just as we did in the unsecured personal loan industry, we're leveraging our technology and core capabilities to put thousands of dollars back into car owners pockets, and we designed the process to deliver a great experience. Notably, it's quick, within minutes you receive the offers for which you qualify, and can see the savings versus your current loan. It's convenient. You don't have to visit the dealer or a bank, in fact, you can complete the process online from virtually anywhere. The only paper is in states where we're required to have an ink signature. Otherwise, you can upload and sign your docs online. ***And it's fair. We don't charge an application fee, origination fee, or a prepayment penalty***. (Emphasis added).

86. The foregoing statements about loan fees were materially false and/or misleading because Defendants knew or recklessly disregarded that: (1) LendingClub did in fact charge an "origination fee" on its loans, which it did not properly disclose to borrowers; (2) the FTC had already launched an investigation into LendingClub's loan practices, including falsely promising consumers they would receive a loan with "no hidden fees;" and (3) the foregoing conduct would subject LendingClub's business practices to heightened regulatory scrutiny and/or regulatory action by the FTC.

87. On February 14, 2017, the Company held its Fourth Quarter of 2016 Earnings Conference Call ("Q4 2016 Earnings Call"). During the Q4 2016 Earnings Call, Defendant

Sanborn stated that "[i]t bears repeating that by supporting bank's demanding diligence and regulatory requirements, we become a better company."

88. The foregoing statements concerning the Company's support of diligence and regulatory requirements were materially false and/or misleading because Defendants' discussing the Company's diligence and regulatory compliance imposed a duty on Defendants to disclose that (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

89. On the same call, Defendant Sanborn stated that

> Our large diversified and stable pool of capital combined with our strong balance sheet gives us the competitive advantage that allows us to expand access to low cost credit borrowers and to successfully navigate changing market environments. ***Part of continuously delivering value to investors is maintaining a transparent, proactive and delivered approach to credit***, a driver of long-term value for LendingClub.

90. The foregoing statement concerning LendingClub's "transparent, proactive, and delivered approach to credit" was materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub's loan processes were not "transparent," and in fact LendingClub was engaged in systemic, material deceit on potential borrowers. Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact,

applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

91. Also speaking on the Q4 2016 Earnings Call, Defendant Casey stated that:

> [B]anks returning to the platform has been a priority for us ***and acts as an endorsement of our strength in compliance and controls***. As Scott mentioned, we have all the key banks back on the platform that purchased between January and April and added five more last quarter. Just as banks are an indication of our strong internal processes, ***I am pleased to report that during the quarter we are able to complete the planned remediation steps related to the material weakness***. (Emphasis added).

92. The foregoing statements regarding the strength of LendingClub's compliance and controls and the steps LendingClub had taken to remediate control problems were materially false and/or misleading because Defendants' discussion of their compliance and completion of remediation imposed a duty on them to disclose adverse facts pertaining to the Company's lack of compliance and remediation of control issues, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

93. On February 28, 2017, LendingClub filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2016 ("2016 10-K"). Defendants Sanborn and Casey signed the 2016 10-K. The 2016 10-K contained signed SOX certifications by Defendants Sanborn and Casey attesting that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

94. The foregoing statements concerning the operations of the Company contained in the certifications Defendants signed in connection with the Company's 2016 10-K were materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub engaged in systemic, material deceit on potential borrowers, belying their claim that maintaining trust with potential borrowers and borrowers was a "key principle." Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

95. The 2016 10-K stated the Company believed that all installment loans offered through its marketplace featured a fixed rate that was "clearly" disclosed to the borrower and which contained "no hidden fees," stating in relevant part:

> We believe that our marketplace provides the following benefits to borrowers:
>
> …
>
> • ***Transparency and Fairness. The installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed***

> ***monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty.*** Small business lines of credit have rates based upon the prime rate and allow borrowers to draw in increments, reducing their interest cost. Our platform utilizes an automated, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications. (Emphasis Added).

96. The 2016 10-K also described LendingClub's new offerings of auto loans, as follows:

> *Auto Refinancing Loans.* ***Commencing in the fourth quarter, we facilitate secured auto refinance loans that can be used to help eligible consumers save money by refinancing into more affordable loans with better rates, clear terms, and no hidden fees.*** Loans terms include amounts ranging from $5,000 to $50,000, with maturities ranging from 24 to 72 months. Borrowers are required to make monthly amortizing payments, and there are no prepayment penalties. (Emphasis Added).

97. The foregoing statements with respect to LendingClub's loans containing "no hidden fees" were false and misleading because Defendants knew or recklessly disregarded that (1) LendingClub did in fact charge "hidden fees" on its loans (2) the FTC had already launched an investigation into LendingClub's loan practices, including falsely promising consumers they would receive a loan with "no hidden fees;" and (3) the foregoing conduct would subject LendingClub's business practices to heightened regulatory scrutiny and/or regulatory action by the FTC.

98. With respect to the "Current Regulatory Environment," the 2016 10-K stated, in relevant part:

> ***Current Regulatory Environment***
>
> …
>
> *Privacy and Data Security Laws*. The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information, and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. ***We have a detailed privacy policy, which complies with***

> ***GLBA and is accessible from every page of our website.*** We maintain consumers' personal information securely, and only share such information with third parties for marketing purposes in accordance with our privacy policy and with the consent of the consumer. In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information. (Emphasis added).

99. The foregoing statement was false and misleading because Defendants knew or recklessly disregarded that LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act, and this conduct would subject LendingClub's business practices to heightened regulatory scrutiny and/or regulatory action by the FTC.

100. In addition, Defendants included in the 2016 10-K various detailed Risk Factors, applicable to its operations and results. Defendants repeated and incorporated these Risk Factors by reference in their entirety into the Company's First Quarter of 2017 Earnings Call held on May 4, 2017 ("Q1 2017 Earnings Call"); the Company's Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017, filed on May 5, 2017 ("Q1 2017 10-Q"); the Company's Second Quarter of 2017 Earnings Conference Call held on August 7, 2017 ("Q2 2017 Earnings Call"); the Company's Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017, filed on August 8, 2017 ("Q2 2017 10-Q"); the Company's Third Quarter of 2017 Earnings Conference Call held on November 7, 2017 ("Q3 2017 Earnings Call"); the Company's Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017, filed on November 8, 2017 ("Q3 2017 10-Q"); and press releases concerning its quarterly results on May 4, 2017 ("May 4, 2017 Press Release"), August 7, 2017 ("August 7, 2017 Press Release") and November 7, 2017 ("November 7, 2017 Press Release"), filing them with the SEC as Exhibit 99.1 to Forms 8-K. In relevant part, the 2016 10-K Risk Factors included:

> ***We and our issuing bank partners are subject to borrower protection laws and federal and state consumer protection laws.***

> We and our issuing bank partners must comply with regulatory regimes, including those applicable to consumer credit transactions, various aspects of which are untested as applied to our marketplace. Certain state laws generally regulate interest rates and other charges and require certain disclosures. In addition, other federal and state laws may apply to the origination and servicing of loans facilitated through our marketplace. In particular, through our marketplace, we may be subject to laws, such as:
>
> …
>
> - ***Section 5 of the Federal Trade Commission Act, which prohibits unfair and deceptive acts or practices in or affecting commerce, and Section 1031 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which prohibits unfair, deceptive or abusive acts or practices in connection with any consumer financial product or service;***
>
> …
>
> - ***the Gramm-Leach-Bliley Act, which includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information, and other privacy laws and regulations.*** (Emphasis added).
>
> …
>
> While we have developed policies and procedures designed to assist in compliance with these laws and regulations, no assurance can be given that these policies and procedures will be effective in preventing violations of these laws and regulations.

101. The foregoing risk factors from the 2016 10-K were false and misleading because Defendants failed to disclose that LendingClub was engaged in systemic, material deceit on potential borrowers. Specifically, Defendants were duty bound to disclose, but failed to disclose that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised

consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action; and therefore, the risks warned of in the 2016 10-K with respect to the Company's compliance with borrower protection and federal and state consumer protection laws had already materialized.

102. On May 5, 2017, the Company filed with the SEC its Q1 2017 10-Q. Defendants Sanborn and Casey signed the Q1 2017 10-Q, which included their signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Defendants Sanborn and Casey signed identical certifications in connection with the Company's filing of the Q2 2017 10-Q and the Q3 2017 10-Q, which the Company filed with the SEC on August 8, 2017 and November 8, 2017, respectively.

103. The foregoing statements concerning the operations of the Company contained in the certifications Defendants signed in connection with the Company's quarterly reports were materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub engaged in systemic, material deceit on potential borrowers, belying their claim that maintaining trust with potential borrowers and borrowers was a "key principle." Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers'

bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

104. On August 7, 2017, Defendants convened the Q2 2017 Earnings Call. During that call, Defendant Sanborn stated, in pertinent part:

> ***We've redesigned our website to make it easier to find through organic search and easier to navigate, resulting in better conversion***.
>
> ***We conducted pricing tests to optimize borrower take rate, we rolled out a new strategy in technology for verifying income and employment, which streamlines the process for borrowers, while increasing efficiency for LendingClub. The sum total of these initiatives result in a better experience for borrowers and better conversion rates for the business. The proof is in the positive feedback we get from our customers***, including the ease of use, money saved and the impact to their financial lives. (Emphasis added).

105. On the same call, Defendant Casey stated, in pertinent part:

> We're very encouraged with the conversion rates we've seen in the quarter and the improvement we saw in sales and marketing as a percent of originations. ***So, a lot of the efforts that Scott mentioned all drive to that. The efforts we have of making our process easier for our consumers and borrowers, as well as the number of tests that we've put in place to optimize the conversion rate. So we feel that those are competitive advantage. We think the data that we have, the insight we have from the many, many points of light we touch with our borrowers that we can actually continue to be very, very competitive despite the environment***. (Emphasis added).

106. The statements regarding better experiences for borrowers were materially false and/or misleading because they misrepresented and failed to disclose that LendingClub engaged in systemic, material deceit on potential borrowers. Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub

falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; (6) the Company had been inundated with complaints from customers and insiders concerning these deceitful practices; and (7) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action..

107. On February 22, 2018, LendingClub filed with the SEC its annual report on Form 10-K for the year ended December 31, 2017 ("2017 10-K"), disclosing the Company's annual financial results and operations. Defendants Sanborn and Casey signed the 2017 10-K. The 2017 10-K contained signed SOX certifications by Defendants Sanborn and Casey attesting that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

108. The foregoing statements concerning the operations of the Company contained in the certifications Defendants signed in connection with the Company's 2017 10-K were materially false and/or misleading because Defendants knew or recklessly disregarded that LendingClub engaged in systemic, material deceit on potential borrowers, belying their claim that maintaining trust with potential borrowers and borrowers was a "key principle." Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the

foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

109. The 2017 10-K omitted the "no hidden fees language" contained in the 2016 10-K in favor of the following:

> **Our Marketplace Solution**
>
> ***
>
> - ***Transparency.*** The installment loans facilitated through our lending marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, an origination fee and the ability to prepay the balance at any time without penalty. Our platform utilizes an automated, rules-based engine for applying the underwriting standards of the related issuing bank partner to an application and income verification, which significantly reduces the human bias associated with reviewing applications.

110. The foregoing statement concerning LendingClub's "transparency" was materially false and/or misleading because Defendants knew or recklessly disregarded, and/or failed to disclose despite being duty-bound to do so, that LendingClub's loan processes were not "transparent," and in fact LendingClub was engaged in systemic, material deceit on potential borrowers. Specifically, Defendants knew or recklessly disregarded that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; and (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action.

111. With respect to the "Current Regulatory Environment," the 2017 10-K stated, in

relevant part:

> ***Current Regulatory Environment***
>
> ***
>
> *Privacy and Data Security Laws*. The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information, and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. ***We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website.*** We maintain consumers' personal information securely, and only share such information with third parties for marketing purposes in accordance with our privacy policy and with the consent of the consumer. In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information. (Emphasis added).

112. The foregoing statement was false and misleading because Defendants knew or recklessly disregarded that LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act, and this conduct would subject LendingClub's business practices to heightened regulatory scrutiny and/or regulatory action by the FTC.

113. In addition, the 2017 10-K disclosed various detailed Risk Factors, applicable to the Company's operations and results. These Risk Factors included, in relevant part:

> [W]e and our issuing bank partners must comply with regulatory regimes, including those applicable to consumer credit transactions, various aspects of which are untested as applied to our lending marketplace. Certain state laws generally regulate interest rates and other charges and require certain disclosures. In addition, other federal and state laws may apply to the origination and servicing of loans facilitated through our lending marketplace.
>
> ***While we have developed policies and procedures designed to assist in compliance with these laws and regulations, no assurance can be***

> ***given that these policies and procedures will be effective in preventing violations of these laws and regulations***.
>
> …
>
> Failure to comply with these laws and regulatory requirements applicable to our business may, among other things, limit our or a collection agency's ability to collect all or part of the principal of or interest on loans. As a result, we may not be able to collect our servicing fee with respect to the uncollected principal or interest, and investors may be discouraged from investing in loans. In addition, ***non-compliance could subject us to damages, revocation of required licenses, class action lawsuits, administrative enforcement actions, rescission rights held by investors in securities offerings and civil and criminal liability, which may harm our business and our ability to maintain our lending marketplace and may result in borrowers rescinding their loans***. (Emphasis added).

114. The foregoing Risk Factors from the 2017 10-K were false and misleading because Defendants failed to disclose that LendingClub was engaged in systemic, material deceit on potential borrowers. Specifically, Defendants were duty bound to disclose, but failed to disclose that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw; (6) consequently, the foregoing conduct would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action; and therefore, the risks warned of in the 2016 10-K with respect to the Company's compliance with borrower protection and federal and state consumer protection laws had already materialized.

**THE TRUTH BEGINS TO EMERGE**

115. On April 25, 2018, the FTC announced in a press release that it had filed a complaint against LendingClub (the "FTC Complaint") alleging violations of, *inter alia*, the FTC Act for

falsely promising consumers they would receive a loan with "no hidden fees[,]" and other deceptive conduct, including unauthorized withdrawals and false promises of loans, all in violation of the FTC rules and regulations, and the Gramm-Leach-Bliley Act for failing to provide customers with a clear and conspicuous privacy notice so that each customer could reasonably be expected to receive actual notice. The press release states, in relevant part:

> **FTC Charges LendingClub with Deceiving Consumers**
> **Defendant promises "no hidden fees" but charges them anyway**
>
> April 25, 2018
>
> ***The Federal Trade Commission has charged the LendingClub Corporation with falsely promising consumers they would receive a loan with "no hidden fees," when, in actuality, the company deducted hundreds or even thousands of dollars in hidden up-front fees from the loans.***
>
> "This case demonstrates the importance to consumers of having truthful information from lenders, including online marketplace lenders," said Reilly Dolan, acting director of the FTC's Bureau of Consumer Protection. "Stopping this kind of conduct will help consumers make informed choices about loan offers."
>
> ***As stated in the FTC's complaint, LendingClub recognized that its hidden fee was a significant problem for consumers, and an internal review noted that its claims about the fee and the amount consumers would receive "could be perceived as deceptive as it is likely to mislead the consumer." An attorney for one of the company's largest investors also warned the company that the "relative obscurity" of the up-front fee in light of the company's prominent "no hidden fees" representation could make the company a target for a law enforcement action.***
>
> ***According to the FTC, LendingClub ignored these and other warnings and, over time, made its deceptive "no hidden fees" claim even more prominent.***
>
> The FTC also alleges that LendingClub falsely told loan applicants that "Investors Have Backed Your Loan" while knowing that many of them would never get a loan, a practice that delayed applicants from seeking loans elsewhere. In addition, in numerous instances, LendingClub has withdrawn double payments from consumers' accounts and has continued to charge those who cancelled automatic payments or paid off their loans, which costs consumers overdraft

> fees and prevents them from making other payments. ***In addition, LendingClub failed to get consumers' acknowledgment of its information-sharing policy as required by law.***
>
> ***The company is charged with violating the FTC Act and the Gramm-Leach-Bliley Act.***
>
> (Emphasis added).

116. The FTC Complaint alleges that the Company was acting in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and 45(n) by using deceptive practices with respect to hidden fees, unauthorized withdrawals and false promises of loan approval.

117. The FTC Complaint also alleges the Company was acting in violation of the Gramm-Leach-Bliley Act due to, *inter alia*, its failure to deliver the initial privacy notice so that each customer could reasonably be expected to receive actual notice, stating in relevant part:

> 47. The Privacy Rule, which implements Sections 501-503 of the [Gramm-Leach-Bliley] Act, 15 U.S.C. §§ 6801-6803, was promulgated by the Federal Trade Commission on May 24, 2000, and became effective on July 1, 2001. 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the Consumer Financial Protection Bureau ("CFPB") became responsible for implementing the Privacy Rule, and promulgated the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. Part 1016 ("Reg. P"), which became effective on October 28, 2014. Defendant's conduct is governed by the Privacy Rule prior to October 28, 2014, and by Reg. P after that date. The GLB Act authorizes both the CFPB and the Federal Trade Commission to enforce Reg. P. 15 U.S.C. § 6805.
>
> 48. Both the Privacy Rule and Reg. P require financial institutions to provide consumers with an initial and annual privacy notice. Both the initial and annual privacy notices must be "clear and conspicuous," 16 C.F.R. § 313.3(b) and 12 C.F.R. § 1016.3(b), and must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. §§ 313.4 and 313.5 and 12 C.F.R. §§ 1016.4 and 1016.5. The privacy notice must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the security and confidentiality policies of the financial institution. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. A financial institution must provide its privacy

notice so that each consumer can reasonably be expected to receive actual notice. 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. For consumers who conduct transactions electronically, a consumer can "reasonably be expected to receive actual notice" if he or she acknowledges receipt of the notice as a necessary step to obtaining the financial product or service. 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9; Privacy of Consumer Financial Information, 65 Fed. Reg. 33646-01, at 33665-66 (May 24, 2000).

49. Defendant failed to comply with the requirements of the Privacy Rule and Reg. P. Specifically, Defendant failed to deliver the initial privacy notice so that each customer can reasonably be expected to receive actual notice. 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. For example, until at least the end of 2016, Defendant did not require customers to acknowledge receipt of the notice as a necessary step to obtaining a particular financial product or service. 16 C.F.R. § 313.9, and Reg. P, 12 C.F.R. § 1016.9. Instead, Defendant required customers to agree only to Defendant's Terms of Use, which itself included only a link to Defendant's privacy policy. In order to reach the privacy notice that Defendant was required to provide to customers, a customer would need to click on a link that did not indicate it was related to privacy, and then further find a link to Defendant's privacy policy within the lengthy document to which the link led. Customers were not provided a clear and conspicuous privacy notice before they submitted nonpublic personal information to Defendant.

* * *

**Count IV**
**VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT**
**("GLB Act")**
**PRIVACY RULE AND REG. P**

63. As described in Paragraph 48, the Privacy Rule and Reg. P require financial institutions to provide customers with a clear and conspicuous privacy notice that accurately reflects the financial institution's privacy policies and practices. Further, financial institutions must deliver the privacy notice so that each customer could reasonably be expected to receive actual notice.

64. Defendant is a financial institution, as defined in Section 509(3)(A) of the GLB Act, 15 U.S.C. § 6809(3)(A).

65. As set forth in Paragraph 49, Defendant failed to deliver the initial privacy notice so that each customer could reasonably be expected to

receive actual notice. Therefore Defendant violated the Privacy Rule, 16 C.F.R. § 313.9, and Regulation P, 12 C.F.R. § 1016.9.

118. On this news, shares of LendingClub fell $.49 per share, or over 15% from its previous closing price to close at $2.77 per share on April 25, 2018, damaging investors.

119. Analysts were shocked and worried about the Company's integrity and regulatory scrutiny going forward. For example, analyst James Faucette of Morgan Stanley issued an analyst report on April 25, 2018 discussing possible loss of investor confidence and increase in regulation. On April 26, 2018, analyst Faucette issued a report entitled "The Rebuttal," after she had spoken with the Company about the allegations, downgrading the stock to Overweight, finding that the "FTC complaint could continue to weigh on the stock until the market has more clarity on path to remediation, especially as LC works to rebuild its shareholder base."

120. Analyst Craig Hallum of Capital Group issued a report on April 26, 2018, lowering his price target, "given the uncertainty on how this could impact LendingClub's business (cash balance could be impacted & demand could potentially be impacted)."

121. By May 5, 2018, the price of LendingClub common stock bottomed out at $2.65 per share.

122. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

123. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of LendingClub during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures and/or the materialization of risks. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

124. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LendingClub securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

126. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

127. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of LendingClub securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

128. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

129. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- LendingClub securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased and/or sold LendingClub securities between the time the Defendants failed to disclose or misrepresented material facts

and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

130. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

131. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

132. Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

133. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

134. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of LendingClub securities during the Class Period.

136. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

137. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

138. As a result of the foregoing, the market price of LendingClub securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of LendingClub securities during the Class Period in purchasing LendingClub securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

139. Had Plaintiffs and the other members of the Class been aware that the market price of LendingClub securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased LendingClub securities at the artificially inflated prices that they did, or at all.

140. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

141. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of LendingClub securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

142. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

144. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

145. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of LendingClub securities.

146. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

147. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: January 7, 2019

Respectfully submitted,

Leigh Handelman Smollar___
Leigh Handelman Smollar

**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Louis Ludwig
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com

**Lead Counsel for Plaintiffs and the Class**

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff