**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MATTHEW VEAL, et al., | Case No. 18-cv-02599-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND** |
| LENDINGCLUB CORPORATION, et al., | [Re: ECF 67; 69] |
| Defendants. | |

This is a putative class action for securities fraud brought against LendingClub Corporation ("LendingClub" or "Company") and its officers Scott Sanborn, Carrie L. Dolan, Bradley Coleman, and Thomas W. Casey ("Individual Defendants"), (collectively with LendingClub, "Defendants"). Plaintiffs have filed a Consolidated Amended Class Action Complaint alleging that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. *See* ECF 63 ("CAC"). Plaintiffs also assert that the Individual Defendants are liable for violations of federal securities laws as "control persons" of LendingClub, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.*

Before the Court is defendants LendingClub, Thomas W. Casey, Bradley Coleman, and Scott Sanborn's motion to dismiss. Mot., ECF 67. Defendant Carrie L. Dolan has filed a separate motion to dismiss. Dolan Mot., ECF 69. The Court heard oral arguments on September 26, 2019. For the reasons set forth herein, both motions to dismiss are GRANTED WITH LEAVE TO AMEND.

## I. BACKGROUND

Defendant LendingClub is a Delaware corporation that operates an online marketplace platform that connects borrowers and investors in the United States. CAC ¶ 20. Defendant Scott

Sanborn ("Sanborn") was LendingClub's Acting Chief Operating Officer ("CEO") from May 6, 2016 until June 28, 2016 and has been LendingClub's CEO since June 28, 2016. *Id.* ¶ 21. In his tenure prior to becoming CEO, Sanborn acted as President, Chief Operating Officer, and Chief Marketing Officer. *Id.* Defendant Carrie L. Dolan ("Dolan") served as the Company's Chief Financial Officer ("CFO") from August 16, 2010 to August 8, 2016. *Id.* ¶ 22. Defendant Bradley Coleman ("Coleman") served as LendingClub's Principal Accounting Officer and Interim-CFO from August 2016 to September 2016. *Id.* ¶ 23. Defendant Thomas W. Casey ("Casey") has been the Company's CFO since September 19, 2016. *Id.* ¶ 24.

Lead Plaintiffs, XiangHong Ding and Zhenbin Chen, have brought this federal securities class action on behalf of themselves and all persons and entities other than Defendants, who purchased or otherwise acquired the publicly traded securities of Lending Club Corporation between May 9, 2016 and April 25, 2018 ("Class Period"). *Id.* ¶ 1. Lead Plaintiffs allege that they purchased LendingClub securities during the Class Period at "inflated prices" and were "damaged upon the revelation of the alleged corrective disclosures and/or materialization of the undisclosed risks." *Id.* ¶¶ 18-19.

**A.    Lending Club's Lending and Borrowing Platform**

LendingClub's borrowers apply for loans through the Company's website. CAC ¶ 36. LendingClub reviews the applicants' creditworthiness and matches the borrower with a lender or lenders to fund entire loans, portions of individual loans, and/or portions of pools of loans. *Id.* LendingClub's primary issuing bank partner, WebBank, simultaneously originates each loan and sells it to LendingClub—at a price that includes fees and interest. *Id.* LendingClub buys these loans with the money from its "matched" lenders, and services the loans. *Id.* LendingClub receives an initial origination fee and subsequent servicing fees on each payment throughout the term of the loan. *Id.*

**B.    LendingClub's Pre-Class Period Internal Control Weaknesses**

In May 2016, LendingClub disclosed that some of its senior officers had deceived an

institutional investor by manipulating application dates to create the false appearance that loans conformed to the investor's express direction.  CAC ¶ 2.  In response, the Company terminated those senior executives, announced the resignation of its founder and CEO (Renaud Laplanche), and disclosed Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") investigations into the allegations regarding its lending practices.  *Id.*  Moreover, LendingClub disclosed "material weaknesses in internal control over financial reporting."  *Id.* ¶ 30.  According to LendingClub's SEC filings, those "material weaknesses" related to: (1) inadequate system to detect and prevent sales of loans in direct contravention of a loan agreement, (2) failure to identify related party transactions so as to ensure proper review and approval or disapproval by the Company's audit committee or its board, and (3) failure to appropriately document, authorize, communicate, and monitor amendments to investor contracts.  ECF 68-3 at 32; *see also* Mot. at 4.  LendingClub claims that these material weaknesses were remedied by December 31, 2016.  *Id.*

## C.   FTC Allegations

On April 25, 2018, Federal Trade Commission ("FTC") issued a press release, disclosing that it had filed a complaint against LendingClub.  CAC ¶ 12; *see also Federal Trade Comm'n v. LendingClub Corp.*, Case 3:18-cv-02454-JSC (N.D. Cal.) ("FTC Action").  The complaint in the FTC Action (attached to and incorporated by reference in the CAC), alleges that LendingClub engaged in "deceptive acts" by (1) charging up-front "hidden fees" and (2) representing to borrowers that they would receive loans before making a final approval decision, resulting in some borrowers not receiving the loans they believed they were approved for.  ECF 64-1 ("FTC Complaint") ¶¶ 56-61.  FTC further alleges that LendingClub engaged in "unfair acts" by withdrawing funds from borrowers' bank accounts without authorization, or in amounts in excess of borrowers' authorization.  *Id.* ¶¶ 62-64.  Finally, FTC alleges that LendingClub violated the Gramm-Leach-Bliley Act ("GLBA") by failing to deliver initial privacy notices.  *Id.*  ¶¶ 65-67.

On the day of FTC's announcement, shares of LendingClub fell $0.49 per share or over 15% from its previous day's closing price to close on April 25, 2018 at $2.77 per share on over 18.8

million shares traded.  CAC ¶ 12.

**D.    LendingClub's Allegedly Deceptive Lending practices**

Plaintiffs' allegations in the CAC mirror to those in the FTC Action.  Plaintiffs allege that by the beginning of the Class Period, in violation of FTC regulations, "Defendants lured borrowers to the LendingClub platform through deceptive practices with respect to loan applications, processing, and approval."  CAC ¶ 5.  Plaintiffs allege three deceptive lending practices: (1) hidden fees, (2) loans promised (and not delivered), and (3) unauthorized bank account withdrawals.  *Id.* ¶¶ 40-67.

First, Plaintiffs allege that Defendants "represented that the Company charged 'no hidden fees,'" when in fact, LendingClub charged borrowers "an up-front fee that was not clearly and conspicuously disclosed, burying reference to the fee multiple clicks into the Company's website." *Id.* ¶¶ 40-41.  LendingClub deducted this fee—on average, approximately 5% of the requested loan amount—from the loan amount before disbursing the funds to the borrower.  *Id.* ¶¶ 41-42. Borrowers frequently complained to Defendants throughout the Class Period that they were not aware of the origination fee that the Company deducted from the full loan amount.  *Id.* ¶¶ 46, 47. LendingClub's customer service representative training materials list as one of the two most frequent post-loan disbursement complaints as "I didn't receive the full loan amount."  *Id.* ¶ 48. LendingClub's quarterly complaint reviews proposed "highlighting [the] origination fee" to address complaint volumes.  *Id.* ¶ 49.

Second, Plaintiffs allege that LendinClub "affirmatively deceived potential borrowers throughout the loan origination process by various means."  *Id.* ¶ 56.  LendingClub follows a three-step loan approval process: (1) a "front-end" review, (2) investor backing, and (3) a "back-end" review.  *Id.* ¶¶ 57-58.  At step one, a front-end review is conducted when a potential borrower completes a personal loan application—at which point LendingClub notifies the consumer that "loan is on the way."  *Id.* ¶ 57.  At step two, once the potential borrower's application generates investor funding and the borrower receives another notification.  *Id.* ¶ 58.  As an example, LendingClub sent

approximately 196,000 consumers an email where subject line read "Hooray! Investors Have Backed Your Loan." *Id.* The body of the email began, in large, bold print, "Your Loan is 100% Backed," and continued: "Great news! Investors have backed your loan 100%. Your money is almost in your hands…." *Id.* At step three, a comprehensive back-end review is performed, which consists of substantial inquiries into the borrower's credit history. *Id.* ¶ 59. Many potential borrowers who received the investor backing notification (*e.g.*, 22% of consumers who received the email mentioned above), were subsequently rejected as a result of the back-end review (and sometimes erroneously). *Id.* ¶¶ 59-60. LendingClub's training materials list "What does that mean? I thought I was approved" as a frequently asked question that customer service representatives should expect to hear. *Id.* ¶ 61.

Third, Plaintiffs allege that in numerous instances during the Class Period, LendingClub withdrew money from borrowers' bank accounts without authorization, or in amounts in excess of what borrowers had authorized. *Id.* ¶ 63. Specifically, Plaintiffs allege that LendingClub, in numerous occasions, (1) withdrew borrowers' monthly payments twice in one month, (2) automatically withdrew monthly payments from borrowers' accounts after the loan was paid in full, and (3) disregarded borrowers' request to stop automatic withdrawals. *Id.* ¶ 64. Hundreds of borrowers contacted LendingClub to complain about its unauthorized withdrawals. *Id.* ¶ 65. The Company's monthly complaint reporting reflected a growing number of complaints about the payoff process and more generally, about payment processing. *Id.* ¶ 67. LendingClub's payments department self-reported increasing numbers of such transactions. *Id.*

Additionally, Plaintiffs allege that in violation of the GLBA, LendingClub failed to provide consumers with clear and conspicuous privacy notices. *Id.* ¶ 9.

**E. Alleged False Statements**

Plaintiffs allege that Defendants made a number of false and misleading statements related to the allegation in the FTC Action. Primarily, these statements fall into the following categories:

5

### i. Statements boasting LendingClub's commitment to compliance, trust, and transparency

For example:

- "[a] key principle of the Company is maintaining the highest levels of trust with borrowers, investors, regulators, stockholders and employees." CAC ¶ 68 (May 9, 2016); *see also id.* ¶ 71 (same date).

- "[o]ur priority is to reaffirm our commitment to trust, compliance and risk management that have been so essential in the success of our online marketplace." *Id.* ¶ 73 (May 9, 2016).

- "Our long-term success is dependent on coupling our technology and business model advantages with a relentless focus on compliance, security and risk management. Since May 9, we have initiated a comprehensive review of our controls, compliance and governance. As I highlighted at our annual meeting, we've made a number of improvements. … And we're retraining employees on both conduct and FX, and reinforcing the importance of a high compliance culture." *Id.* ¶ 83 (August 8, 2016).

- "[i]t bears repeating that by supporting bank's demanding diligence and regulatory requirements, we become a better company." *Id.* ¶ 87 (February 14, 2017).

- "Part of continuously delivering value to investors is maintaining a transparent, proactive and delivered approach to credit, a driver of long-term value for LendingClub." *Id.* ¶ 89 (February 14, 2017).

- "[B]anks returning to the platform has been a priority for us and acts as an endorsement of our strength in compliance and controls." *Id.* ¶ 91 (February 14, 2017).

Plaintiffs allege that these statements' emphasis on LendingClub's commitment to compliance and its reassurance that maintaining trust was a "key principle" was false or misleading because "Defendants knew or recklessly disregarded" that the Company was engaging in the practices alleged in the FTC Action, which consequently, "would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action." *Id.* ¶¶ 69; 72, 74. Plaintiffs also allege that Defendants' discussion of the Company's "diligence and regulatory compliance imposed on them a duty to disclose" that LendingClub was engaged in the conduct alleged in the FTC Action. *Id.* ¶¶ 88; 84; 92. According to Plaintiffs, "Defendants knew or recklessly disregarded that LendingClub's loan processes were not 'transparent.'" *Id.* ¶ 90.

6

### ii.  Statements regarding LendingClub's 2016 Internal Control Weaknesses

For example:

- "[a] violation of the company's business practices … was unacceptable to the board. And this is not something the board will compromise on in anyway."  CAC ¶ 71 (May 9, 2016); *see also id.* ¶ 68 (same date).

- "As Scott mentioned, we have all the key banks back on the platform that purchased between January and April and added five more last quarter. Just as banks are an indication of our strong internal processes, I am pleased to report that during the quarter we are able to complete the planned remediation steps related to the material weakness." *Id.* ¶ 91 (February 14, 2017).

Plaintiffs allege that this statement was false or misleading because "Defendants' discussion of their compliance and completion of remediation imposed a duty on them to disclose adverse facts pertaining to the Company's lack of compliance and remediation of control issues, which were known to Defendants or recklessly disregarded by them."   *Id.* ¶ 92.  Specifically, Plaintiffs allege that "Defendants made false and/or misleading statements and/or failed to disclose" the practices alleged in the FTC Action, subjecting "LendingClub's business practices to heightened FTC scrutiny and/or regulatory action." *Id.*

### iii.  Statements regarding LendingClub's process and website improvements

For example:

- "We've redesigned our website to make it easier to find through organic search and easier to navigate, resulting in better conversion.

  We conducted pricing tests to optimize borrower take rate, we rolled out a new strategy in technology for verifying income and employment, which streamlines the process for borrowers, while increasing efficiency for LendingClub. The sum total of these initiatives result in a better experience for borrowers and better conversion rates for the business. The proof is in the positive feedback we get from our customers, including the ease of use, money saved and the impact to their financial lives." CAC ¶ 104 (August 7, 2017).

- "The efforts we have of making our process easier for our consumers and borrowers, as well as the number of tests that we've put in place to optimize the conversion rate. So we feel that those are competitive advantage. We think the data that we have, the insight we have from the many, many points of light we touch with our borrowers that we can actually continue to be very, very competitive despite the environment." *Id.* ¶ 105 (August 7, 2017).

7

Plaintiffs allege that these statements were materially false or misleading because Defendants knew or recklessly disregarded that LendingClub was engaging in the practices alleged to be deceptive or unfair in the FTC Action and that such conduct "would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action." *Id*. ¶ 106.

### iv. Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")

For example:

- "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." CAC ¶¶ 80 (May 16, 2016); 93 (February 28, 2017); 102 (May 5, 2017); 107 (February 22, 2018).

Plaintiffs allege that these certifications were materially false or misleading because Defendants "knew or recklessly disregarded" that LendingClub engaged in the practices alleged in the FTC Action, contrary to Defendants' claims that "maintaining trust with potential borrowers and borrowers was a 'key principle,'" and that such conduct "would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action." *Id.* ¶¶ 82; 94; 103; 108.

### v. Statements regarding LendingClub's privacy policy

For example:

- "We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website." CAC ¶¶ 98 (February 28, 2017); 111 (February 22, 2018).

Plaintiffs allege that this statement was false and misleading because "Defendants knew or recklessly disregarded that LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act, and this conduct would subject LendingClub's business practices to heightened regulatory scrutiny and/or regulatory action by the FTC." *Id.* ¶¶ 99; 112.

### vi. Statements disclosing regulatory risks

For example:

- "The collection, processing, storage, use and disclosure of personal data could give

8

rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights…. Any inability to adequately address privacy concerns, even if unfounded, or to comply with applicable privacy or data protection laws, regulations and privacy standards, could result in additional cost and liability for us, damage our reputation, inhibit use of our marketplace and harm our business." CAC ¶ 76 (incorporated by reference in SEC filings on May 16, 2016, August 9, 2016, and November 9, 2016).

- "We and our issuing bank partners are subject to borrower protection laws and federal and state consumer protection laws…. In particular, through our marketplace, we may be subject to laws, such as:
  ***
  Section 5 of the Federal Trade Commission Act, which prohibits unfair and deceptive acts or practices in or affecting commerce, …
  ***
  the Gramm-Leach-Bliley Act, which includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties …
  We may not always have been, and may not always be, in compliance with these laws. Compliance with these laws is also costly, time-consuming and limits our operational flexibility…." *Id.* ¶78 (incorporated by reference in SEC filings on May 16, 2016, August 9, 2016, and November 9, 2016); *see also* ¶ 100 (February 28, 2017).

- "While we have developed policies and procedures designed to assist in compliance with these laws and regulations, no assurance can be given that these policies and procedures will be effective in preventing violations of these laws and regulations.
  …
  Failure to comply with these laws and regulatory requirements applicable to our business may, among other things, limit our or a collection agency's ability to collect all or part of the principal of or interest on loans. As a result, we may not be able to collect our servicing fee with respect to the uncollected principal or interest, and investors may be discouraged from investing in loans. In addition, non-compliance could subject us to damages, revocation of required licenses, class action lawsuits, administrative enforcement actions, rescission rights held by investors in securities offerings and civil and criminal liability, which may harm our business and our ability to maintain our lending marketplace and may result in borrowers rescinding their loans." *Id.* ¶ 113 (February 22, 2018).

Plaintiffs allege that these statements were false and misleading because Defendants "failed to disclose that LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act and, therefore, that the risks discussed with respect to its failure to comply with such regulations

9

had already materialized." *Id.* ¶ 77. Plaintiffs also allege that Defendants "were duty bound to disclose, but failed to disclose" that LendingClub engaged in the conduct alleged in FTC's Complaint, which "subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action; and therefore, the risks warned of in the [statements] with respect to the Company's compliance with borrower protection and federal and state consumer protection laws had already materialized." *Id.* ¶¶ 79; 101; 114.

### vii. Statements regarding "hidden fees"

For example:

- "We believe that our marketplace provides the following benefits to borrowers:

  …

  **Transparency and Fairness.** The installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty." CAC ¶ 95 (February 28, 2017).

Plaintiffs allege that lending Club's statements containing "no hidden fees" were false and misleading because "(1) LendingClub did in fact charge 'hidden fees' on its loans (2) the FTC had already launched an investigation into LendingClub's loan practices, including falsely promising consumers they would receive a loan with 'no hidden fees;' and (3) the foregoing conduct would subject LendingClub's business practices to heightened regulatory scrutiny and/or regulatory action by the FTC." *Id.* ¶ 97.

Furthermore, Plaintiffs allege that LendingClub's 2017 10-K filing removed the "no hidden fee language" contained in the 2016 10-K, which was replaced with the following statement:

> "***Transparency.*** The installment loans facilitated through our lending marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, an origination fee and the ability to prepay the balance at any time without penalty."

*Id.* ¶ 109 (February 22, 2018). Plaintiffs allege that this statement is also false and

misleading because "Defendants knew or recklessly disregarded, and/or failed to disclose despite being duty-bound to do so, that LendingClub's loan processes were not 'transparent'," and the Company had engaged in the lending practices alleged in FTC's Complaint, subjecting "LendingClub's business practices to heightened FTC scrutiny and/or regulatory action." *Id.* ¶ 110.

### viii. Statements regarding LendingClub's auto refinance products.

For example:

- "We don't charge an application fee, origination fee, or a prepayment penalty." CAC ¶ 85 (November 7, 2016).

- "Auto Refinancing Loans. Commencing in the fourth quarter, we facilitate secured auto refinance loans that can be used to help eligible consumers save money by refinancing into more affordable loans with better rates, clear terms, and no hidden fees." *Id.* ¶ 96 (February 28, 2017).

At the September 26, 2019 hearing, Plaintiffs conceded that LendingClub's auto refinance products did not charge an origination fee and were not subject to the FTC Action. *See* ECF 88 at 30:6-9.

### F. Confidential Witnesses' Statements Regarding Hidden Fees

Plaintiffs offer statements by three confidential witnesses ("CW"). CAC ¶¶ 43-55. The CWs' statements relate solely to the "hidden fee" allegations.

Confidential Witness 1 ("CW1") is identified as a member support representative at LendingClub from March 2016 to March 2018 in the Company's main office in San Francisco, California. *Id.* ¶ 43. CW1 reported to the Operations Supervisor, who in turn reported to the Member Support Manager. *Id.* CW1 stated that "for online applicants, the only place the one-time fee was mentioned was far down the page and in very small print." *Id.* CW1 also stated that "the Company routinely trained and managed its support representatives to ensure consumer confusion. For example, … the Company timed each support call, and managers directed support representatives to devote no more than four minutes and thirty seconds to each call, an insufficient time to answer potential borrowers' questions about the loan process." *Id.* ¶ 44. CW1 further stated

that "the Company's management knew that support representatives were not adequately informing consumers about the loan process and hidden fees." *Id.* According to CWI, "[customer] representatives never explicitly let consumers know about the origination fee – it was up to the consumers to find and read it" and "management instructed representatives not to read truth-in-lending disclosures to consumers." *Id.*

CW1 further stated that "the Company's managers, including CW1's direct supervisors and Company executives, including Defendant Sanborn, were aware of the confusion consumers faced due to LendingClub's misleading statements." *Id.* ¶ 45. Also, according to CW1, "given the general awareness within the Company of the hidden fee problem and Sanborn's hands-on management style, Sanborn and other top management were aware that the Company was misleading potential borrowers about the hidden origination fees." *Id.*

Confidential Witness 2 ("CW2") is identified as senior credit specialist at LendingClub in the San Francisco office from August 2014 to September 2016. *Id.* ¶ 50. CW2 spent the "first few [sic] at LendingClub working as a member support representative before becoming a credit specialist." *Id.* CW2 "confirmed that the Company received numerous consumer complaints about the origination fees." *Id.* CW2 "participated in regular meetings with Senior Vice President of Operations Darin Cline, in which member support staff voiced concerns about the constant stream of calls from borrowers expressing confusion after receiving loan proceeds less than they expected." *Id.*

Confidential Witness 3 ("CW3") is identified as member support representative at LendingClub from July 2015 to August 2016, and thereafter as a payment processing specialist from September 2016 to September 2017 based at the Company's main office in San Francisco. *Id.* ¶ 51. CW3 took approximately 200 calls each day from borrowers, approximately one quarter to one third of those calls from borrowers upset after receiving materially less loan proceeds than they expected. *Id.* According to CW3, "[m]any of those borrowers expressed feeling cheated because the Company had claimed they did not charge fees, or told them they would receive an amount that differed from

12

what they had ultimately received." *Id.*

CW3 also stated that "many borrowers attempted to return the money they had borrowed to LendingClub, and that many were unable to because they had called after their grace period had expired" and "[b]orrowers frequently claimed the Company had told them the loan would be 'free' and that no fees would be taken off the top." *Id.* ¶ 52.  According to CW3, many borrowers failed to notice the "fee disclosure language"—located farther down the form and in several sizes smaller type than the other information—because "they had been assured there were no hidden fees, and, therefore, were not analyzing the disclosures as closely as they otherwise would have." *Id.*

CW3 reported that "borrowers were upset because the 'free loan' language in LendingClub's promotional materials led those borrowers to believe that LendingClub would not take any fees out of the loan amount for which they had been approved." *Id.* ¶ 53.  According to CW3, "management trained member support representatives specifically to deal with consumers upset about the hidden origination fee." *Id.* ¶ 54.  In particular, CW3 stated that "the Company trained all member support representatives to direct borrowers to where the Company had disclosed the origination fee during the loan process" and "to scroll through large documents with complaining borrowers, showing several lines in far smaller type that summarized the origination fee." *Id.*  CW3 further noted that it was difficult for borrowers to notice the fee disclosure during the loan origination process because of its "placement" and "the very small print in which it appeared, much smaller than the amount financed and the amount received." *Id.* ¶ 55.

## II.    LEGAL STANDARD
### A.    Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese*

13

*v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. Rule 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701. Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ...." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

14

### III. JUDICIAL NOTICE

As a preliminary matter, Defendants request that the Court take judicial notice of 22 exhibits in support of their motions to dismiss the CAC: (1) First Amended Complaint, Docket Number 57, filed in the FTC Action (Talarides Decl. Exh. A, ECF 68-1); (2) LendingClub's SEC filings (Talarides Decl. Exhs B-J, ECF 68-2–68-10; Wang Decl. Exhs 1-3. ECF 70-1–70-3); (3) S&P's transcript of LendingClub's earnings calls (Talarides Decl. Exhs K-O, ECF 68-11–68-15); (4) LendingClub's press release dated May 9, 2016 attached to SEC filings (Talarides Decl. Exh. P, ECF 68-16); (5) SOX certifications attached to SEC filings (Talarides Decl. Exh. Q, ECF 68-17); (6) Statements of Changes in Beneficial Ownership of Securities on Form 4, filed with the SEC (Talarides Decl. Exh. R, ECF 68-18); and (7) LendingClub's Answer in the FTC Action (Talarides Decl. Exh. S, ECF 68-19).

While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute." Courts have taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Plaintiffs do not oppose the request as to those documents referenced in the CAC but note that "judicial notice is not appropriate for the purpose of determining the truth of any of those statements." Opp'n at 25. The Court agrees that it would be improper to take notice of facts that might reasonably be disputed, or to draw inferences from such documents. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (taking judicial notice of reports referred to in complaint for their "existence," but holding "we may not, on the basis of these reports, draw inferences or take notice of facts that might reasonably be disputed"); *Lee*, 250 F.3d at 688. Plaintiffs clearly dispute the truth and the inferences drawn from certain facts in the judicially noticed exhibits. *See* Opp'n

at 25. The Court takes judicial notice of the documents referenced in the CAC but not for the truth of any of the facts asserted in these documents.

Plaintiffs also oppose the request as to the documents not referenced in the CAC (Talarides Decl. Exhibits I, J, R, and S) because they are "offered only to contradict the Complaint's well-pleaded factual allegations." Opp'n at 24. Plaintiffs do not dispute the authenticity of those Exhibits or that each of them is subject to judicial notice under Fed. R. Evid. 201(b).

Plaintiffs' objection to Exhibit S (ECF 68-19), LendingClub's Answer filed in the FTC Action is without merit. A court may take judicial notice of documents filed in judicial or administrative proceedings. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992). Defendants rely on Exhibit S to show LendingClub's responses to the FTC's allegations. Reply at 15, ECF 78. Ironically, Plaintiffs rely (repeatedly) on the supposedly objectionable document to show that LendingClub admitted to certain allegations in the FTC Action. Opp'n at 1-2; 3; 5; 11. The Court takes judicial notice of Exhibit S.

Defendants seek judicial notice of Exhibits I and J (excerpts of Form 10-Qs filed with the SEC) to show that, "since the filing of the FTC Action, LendingClub has maintained its belief that it complied with all applicable laws related to the FTC Action and will vigorously defend the lawsuit." Reply at 15. The Court considers these documents for the sole purpose of determining what representations LendingClub made to the market. The Court does not take notice of the truth of any of the facts asserted in these documents.

Finally, Defendants seek judicial notice of Exhibit R (Form 4s filed with the SEC) to show that "two of the Individual Defendants purchased LendingClub stock during the Class Period." Reply at 15. Plaintiffs do not dispute the fact that these stock purchases occurred. The Court agrees with Defendants that Forms 4s filed with the SEC are appropriate subjects of judicial notice. *Welgus v. TriNet Grp., Inc.*, No. 15-CV-03625-BLF, 2017 WL 6466264, at *5 (N.D. Cal. Dec. 18, 2017), aff'd, 765 F. App'x 239 (9th Cir. 2019). Defendants' request for judicial notice is GRANTED.

## IV. DISCUSSION

### A. Claim 1 - Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a securities fraud claim, plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017).

### i. Non-Actionable Statements and Omissions

To adequately plead a material misrepresentation or omission under § 10(b), the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041–42 (N.D. Cal. 2014).

A material misrepresentation differs significantly from corporate puffery. Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (finding that puffery includes statements "not capable of

17

United States District Court
Northern District of California

objective verification"). Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Finally, "mildly optimistic, subjective assessment[s] . . . [do not] amount[ ] to a securities violation." *Id.*

An omission, by contrast, "refers to the failure to disclose material information about a company." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). "[A]n omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information made available." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1061 (citations and internal quotation marks omitted); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011).

Defendants argue that many of the allegedly false statements are "inactionable puffery." *See* Mot. at 9-11. Plaintiffs disagree. *See* Opp'n at 14-15. The Court agrees with Defendants that the statements touting LendingClub's focus on compliance, building trust with various stakeholders, and transparency are examples of corporate optimism and puffery. "The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Stearns v. Select Comfort Retail Corp.*, No. 08-cv-02746 JF, 2009 WL 1635931, at *11 (N.D. Cal. June 5, 2009). Statements such as "[o]ur priority is to reaffirm our commitment to trust, compliance and risk management" (CAC ¶ 73), "[o]ur long-term success is dependent on . . . a relentless focus on compliance, security and risk management" (*id.* ¶ 83), and "banks returning to the platform has been a priority for us and acts as an endorsement of our strength in compliance and controls" (*id.* ¶ 91) are not capable of objective verification. *See In re Facebook, Inc. Sec. Litig.*, No. 5:18-CV-01725-EJD, 2019 WL 4674347, at *17 (N.D. Cal. Sept. 25, 2019) (finding statements of general compliance to be "inactionable corporate puffery"); *see also Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) ("[C]ompliance for the organization has really been job one for us" is inactionable puffery); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352,

18

370 (E.D.N.Y. 2013) (finding "the compliance program was 'robust' or 'best-of-class'" constituted corporate puffery rather than actionable misrepresentations).

Similarly, "[a] key principle of the Company is maintaining the highest levels of trust with borrowers, investors, regulators, stockholders and employees" (CAC ¶¶ 68; 71) and "[i]t bears repeating that by supporting bank's demanding diligence and regulatory requirements, we become a better company" (*id.* ¶ 87) are not actionable because the statements lacks detailed factual assertions. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (finding evident the "aspirational nature" of statements such as "[l]et us commit together" to "build trust in everything" and to "conduct[] business consistent with the high ethical standards"). As another example, "maintaining a transparent, proactive and delivered approach to credit [is] a driver of long-term value for LendingClub" (CAC ¶ 89) is too generalized to be actionable. *See In re Paypal Holdings, Inc. Shareholder Derivative Litig.*, No. 17-CV-00162-RS, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018) (finding "not actionable as a matter of law," statements that are "too general to give rise to any particular impression" about the company's business practices); *see also Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018) (agreeing with the district court that "generalized statements about [the company's] transparency, quality, and responsibility are the sort of puffery that a reasonable investor would not rely on).

Plaintiffs rely on *In re Petrobras* to argue that "even if statements regarding compliance could, 'viewed in isolation,' constitute puffery, where (as here) they 'were made repeatedly in an effort to reassure the investing public about the Company's integrity,' a reasonable investor 'could rely on them as reflective of the true state of affairs at the Company." Opp'n at 15 (citing *In re Petrobras Sec. Litig.* 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). Plaintiffs fail, however, to acknowledge the extreme underlying facts present in *In re Petrobras*. There, the company made statements regarding the integrity of its management and "touted its Code of Ethics and corruption prevention program," **while** its executives engaged in "rampant fraud and corruption" which led to

19

"the arrest of high-level Petrobras executives and prompted investigations by Brazilian and U.S. authorities." *Id.* at 373-75. As the Court in *In re Petrobras* explained, "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Id.* at 381 (citation omitted). And the context in which the statements at issue in *In re Petrobras* were made have no resemblance to the facts alleged in this case.

Finally, Defendants argue that statements touting LendingClub's process and website improvements (CAC ¶¶ 104; 105) are also non-actionable puffery. Mot. At 10-11. The Court agrees with Defendants that certain portions of these statements are corporate optimism. For example, "[w]e've redesigned our website to make it easier to find through organic search and easier to navigate" (*id.* ¶ 104) is not actionable. *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036–37 (N.D. Cal. 2012) (finding "[w]e are very pleased with the learning from our pilot launch" and "[w]e are confident the improved features in user experience … will increase and sustain utilization" to be non-actionable puffing). However, when read in their entirety, these statements include some specific facts, capable of objective verification. *See e.g.* CAC ¶¶ 104 ("positive feedback we get from our customers"; 105 ("the number of tests that we've put in place to optimize the conversion rate"). Therefore, the Court declines to dismiss these statements (*id.* ¶¶ 104; 105) as non-actionable puffery. However, as discussed below, the CAC fails to allege facts as to their falsity.

In sum, the Court finds that the alleged misstatements boasting LendingClub's commitment to compliance, trust, and transparency (CAC ¶¶ 68, 71, 73, 83, 87, 89, and the first sentence of ¶ 91) are non-actionable puffery.

### ii. Falsity

Having distilled out the non-actionable portions of the statements of which Plaintiffs complain, the Court must now determine whether the CAC specifies the reason or reasons why the remaining statements are false or misleading. *See* 15 U.S.C. § 78u-4(b)(1). In the Ninth Circuit, plaintiffs may establish falsity in three ways: "if (1) the statement is not actually believed, (2) there

20

is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Align Tech., Inc.*, 856 F.3d at 616. In order to plead falsity, a plaintiff must plead "specific facts indicating why" the statements at issue were false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them"). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH*, 540 F.3d at 1070.

### a. Non-Disclosure of Practices in FTC's Complaint

As an initial matter, the Court addresses Plaintiffs' allegations that various statements made during the Class Period were false or misleading because Defendants "were duty bound to disclose, but failed to disclose that: (1) LendingClub falsely promised consumers they would receive a loan with 'no hidden fees' when the Company charged a hidden origination fee to all borrowers; (2) LendingClub's privacy policy did not comply with the [GLB] Act; (3) LendingClub falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (4) LendingClub withdrew funds from consumers' bank accounts without consumers' authorization; (5) LendingClub withdrew funds from consumers' bank accounts in excess of the amount consumers authorized LendingClub to withdraw." CAC ¶ 79; *see also id.* ¶¶ 77, 84, 86, 88, 92, 101, 106, 110, 114. Plaintiffs' enumerated "omissions" are precisely what is alleged in the FTC Action, filed *after* the Class Period ended.

"[C]ompanies are not required to engage in 'self-flagellation' by disclosing unproven allegations." *In re Facebook*, 2019 WL 4674347, at *17 (finding no duty to disclose potential privacy breaches when, at the time corporate statement were made, "the FTC only stated an intent to investigate" but had not made any formal findings of a violation); *In re Paypal*, 2018 WL 466527, at *3 ("Federal securities laws do not impose upon companies a 'duty to disclose uncharged, unadjudicated wrongdoing.'") (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)).

21

The FTC had not charged LendingClub with any violations within the Class Period. Moreover, LendingClub, during the Class Period, repeatedly disclosed that FTC was investigating the Company. *See* ECF 68-2 at 143 ("The FTC Staff is investigating questions concerning certain of the Company's policies and practices and related legal compliance."); *see also* ECF 68-5 at 4; ECF 68-3 at 127; ECF 68-6 at 25; ECF 68-7 at 31; ECF 68-8 at 37. Having done so, Defendants were not required to "confess" to the uncharged allegation. *City of Pontiac Policemen's & Firemen's*, 752 F.3d at 184 ("Disclosure is not a rite of confession[.]"). The Court concludes that LendingClub was not "duty-bound" to disclose the allegations in FTC's Complaint before it was filed.

That said, it appears that Plaintiffs may be inferring that Defendants had knowledge of the practices alleged in the FTC Action because of FTC's pre-suit investigation into those matters. *See* CAC ¶ 86; 97 ("[T]he FTC had already launched an investigation into LendingClub's loan practices, including falsely promising consumers they would receive a loan with 'no hidden fees[.]'").[1] However, the mere existence of an FTC investigation—which LendingClub disclosed to investors—does not mean that Defendants were aware of the conduct eventually alleged in the FTC Action nearly two years later, or that such conduct violated FTC rules. Specifically, Plaintiffs fail to allege (1) *when* the FTC investigation began, (2) *what* the substance of FTC's investigation was, and (3) *if* and *when* FTC notified Defendants that LendingClub was allegedly in violation of FTC rules for the conduct alleged in the CAC.

### b. Lack of connection between statements and alleged reasons for their falsity

In order to plead falsity, a plaintiff must allege "specific facts indicating why" the statements

---

[1] Ironically, Plaintiffs also discount LendingClub's disclosure of the FTC investigation as a "red herring" because, according to Plaintiffs, "the FTC investigation related to [LendingClub's] earlier fraudulent practices which were part of an earlier and separate fraud." Opp'n at 17; *see also id.* at 1. Since Plaintiffs have not alleged that two independent FTC investigations were ongoing during the Class Period, they cannot claim that the investigation mentioned in the CAC was both about *and* unrelated to the FTC Action later filed.

at issue were false. *Metzler Inv. GMBH*, 540 F.3d at 1070. Many of the alleged misstatements in the CAC do not relate to the business practices at issue in the FTC Action, and thus, the reasons Plaintiffs offer as to why many of the statements are false or misleading bear no connection to the substance of the statements. As a result, the CAC lacks any particularized allegations demonstrating that these statements were materially false or misleading when made. *See Hong v. Extreme Networks, Inc.*, No. 15-CV-04883-BLF, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017) (finding plaintiffs' allegations insufficient when "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves"); *see also In re Facebook*, 2019 WL 4674347, at *23.

For example, in discussing the 2016 Internal Control Weaknesses which led to the resignation of the Company's CEO, a LendingClub executive stated that "[a] violation of the company's business practices … was unacceptable to the board. And this is not something the board will compromise on in anyway." CAC ¶ 71. Similarly, Defendant Casey stated that he was "pleased to report that during the quarter we are able to complete the planned remediation steps related to the material weakness." *Id.* ¶ 91. Plaintiffs argue that these statements are "false and/or misleading" because Defendants' discussion of the Company's compliance and completion of remediation imposed a duty "to disclose adverse facts pertaining to the Company's lack of compliance and remediation of control issues." *Id.* ¶ 92. Such vague allegations fail the "particularly" requirement of PSLRA. LendingClub's 2016 Internal Control Weaknesses related to internal controls over financial reporting (*id.* ¶ 30), which simply have no connection to the consumer-facing business practices involved in the FTC Action. *See Rok v. Identiv, Inc*., No. 15-CV-5775-CRB, 2017 WL 35496, at *6-7 (N.D. Cal. Jan. 4, 2017) (finding no obligation to disclose "the existence of a separate, ongoing material weakness" in statements about another internal control weakness), *aff'd*, 716 F. App'x 663 (9th Cir. 2018).

Plaintiffs argue that "Defendants disclosed the DOJ's and SEC's investigations into the loan doctoring scheme on the first day of the current Class Period, however, they failed to disclose that

23

internal control weaknesses and reputational damage would persist from undisclosed, fraudulent loan practices -- this time to borrowers (or 'consumers')." Opp'n at 2. But, in order to be actionable, an omission must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, Inc., 65 F. Supp. 3d 840, 855 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017). The statements discussing LendingClub's 2016 control weaknesses (and the subsequent regulatory investigations), relate only to financial reporting and cannot reasonably create an impression, of any kind, of the "state of affairs" as to consumer-related loan practices at issue in this case. To allege misleading omissions, it is "not enough to allege that a statement is incomplete; rather, the plaintiff must state facts showing that, due to its incompleteness, the statement affirmatively led the plaintiff in a wrong direction (rather than merely omitted to discuss certain matters)." *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1101 (N.D. Cal. 2013). The CAC fails to adequately link Defendants' representations with the underlying claims in the FTC Action to show that omitting the alleged practices "affirmatively led the [P]laintiff[s] in a wrong direction." *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-CV-05558-HSG, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018).

Similarly, the statements regarding LendingClub's process and website improvements, even where not non-actionable puffery as discussed earlier, are entirely unrelated to the loan practices Plaintiffs complain of. These statements tout a redesigned website and "a new strategy in technology for verifying income and employment", resulting in a "better [and streamlined] experience for borrowers," which is confirmed by "positive feedback from [LendingClub's] customers." CAC ¶¶ 104, 105. Plaintiffs allege that these statements were materially false or misleading because Defendants "knew or recklessly disregarded" that LendingClub was engaging in the practices alleged in the FTC Action and that such conduct "would subject LendingClub's business practices to heightened FTC scrutiny and/or regulatory action." *Id*. ¶ 106. But that is not what these representations were about—only that the technologically-improved system resulted in

24

positive customer feedback and better conversion rates, facts that Plaintiffs do not challenge.

Likewise, LendingClub's SOX certifications are wholly untethered to Plaintiffs' described reasons for falsity. In three occasions, some Defendants certified that "[t]he information contained in the [financial] Report fairly presents, in all material respects, the ***financial condition*** and ***results of operations*** of the Company." CAC ¶ 80; 102; 107 (emphasis added). The CAC is devoid of any allegation regarding LendingClub's financial condition and results of operations. Instead, Plaintiffs argue that these statements "are actionable because Defendants were aware, or recklessly disregarded that statements about the Company's operations were materially false." Opp'n at 15. Setting aside that that the CAC does not mention "the Company's operations" at all – these certifications only apply to financial condition and ***results of*** operations of the Company. Absent any allegations of financial wrongdoing, the SOX certifications have no nexus to Plaintiffs' reasons for falsity. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 654 (S.D.N.Y. 2017) ("Plaintiff has failed to plead that that [SOX] certification was false or misleading because…, the amended complaint does not adequately allege a nexus between the alleged [wrongful act] and [the company's] financial condition or results of operations, or that the Company's *financial reports* contained inaccuracies.").

### c. Lack of particularity in allegations

As for the remaining statements, the CAC fails to allege falsity with particularity.

#### 1. Statements regarding Lending Club's Privacy Policy

Plaintiffs allege that the statements regarding LendingClub's privacy policy were false because "Defendants knew or recklessly disregarded that LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act, and this conduct would subject LendingClub's business practices to heightened regulatory scrutiny and/or regulatory action by the FTC." CAC ¶¶ 99; 112. These statements appear in LendingClub's 10-K filings under the "Current Regulatory Environment" headings and provide as follows: "We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website." *Id.* ¶ 98; 111.

25

Plaintiffs' sole basis for alleging that LendingClub's privacy policy was not compliant with GLBA is the FTC Action. *See* FTC Complaint at ¶ 65-67. But, at a minimum, "to meet the requirements of Rule 9(b), Plaintiffs must, for each allegedly false or misleading statement, clearly allege with particularity *why* the statement was false or misleading *at the time it was made*." *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, No. 15-CV-02938-HSG, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016); *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996) ("[S]tatement or omission must be shown to have been false or misleading when made.") The two statements regarding GLBA compliance were issued on February 28, 2017 and February 22, 2018. CAC ¶¶ 93; 107. It is not enough to allege that LendingClub was charged with violating the GLBA *after* the statements were made. The CAC fails to allege *when* (if ever) Defendants became aware of the alleged non-compliance with GLBA in advance of the FTC Complaint.

Moreover, Defendants point out—and Plaintiffs do not challenge—that FTC's allegations regarding LendingClub's privacy policy are limited to conduct that ended in 2016. Mot. at 14; FTC Complaint ¶ 51; 52. If so, both statements were made *after* the allegedly noncompliant conduct had ceased and therefore were not, in fact, false when made.[2]

### 2. Statements disclosing regulatory risks

The CAC suffers from similar deficiencies as to the statements disclosing regulatory risks. Plaintiffs allege that the statements disclosing risks related to legal compliance (*see e.g.*, CAC ¶¶ 76, 78, 100, 103) were "false and/or misleading" because "the risks warned of in the [statements] with respect to the Company's compliance with borrower protection and federal and state consumer protection laws had already materialized." *Id.* ¶¶ 79; 101; 114.

LendingClub warned investors that "no assurance can be given that [LendingClub's] policies

---

[2] Defendants argue that the FTC allegations regarding LendingClub's privacy policy relate to the delivery of the initial privacy notice and not the privacy policy itself. Mot. at 14. The Court finds this argument a distinction without a difference. Count IV in the FTC Complaint clearly alleges that LendingClub violated the GLB Privacy Rule, 16 C.F.R. § 313, and Reg. P., 12 C.F.R. § 1016. FTC Complaint ¶¶ 65-67.

26

and procedures will be effective in preventing violations of" laws and regulations—including those at issue in the FTC Action. CAC ¶ 100, *see also id.* ¶¶ 78; 100 ("[W]e may be subject to laws, such as: … Section 5 of the Federal Trade Commission Act … [and] the Gramm-Leach-Bliley Act. …"). "Where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." *In Re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR, 2014 WL 5525946, at *12 (N.D. Cal. Oct. 31, 2014) (internal citation omitted). LendingClub warned investors about the risks of the same violations FTC alleges **and** disclosed the FTC Investigation. Under these circumstances, it cannot be said that the omission of the specific loan practices alleged in FTC Action "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Id.*

According to Plaintiffs, Defendants "failed to disclose that LendingClub's privacy policy did not comply with the Gramm-Leach-Bliley Act and, therefore, that the risks discussed with respect to its failure to comply with such regulations had already materialized." *Id.* ¶ 77. But, as discussed above, Plaintiffs fail to allege that LendingClub was (1) in violation of GLBA **at the time** the risk disclosure statements were made and (2) Defendants were aware of such violation.

Plaintiffs rely on *Flynn v. Sientra, Inc.*, 2016 WL 3360676 (C.D. Cal. June 9, 2016) and *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015) to argue that "Defendants had a duty to disclose deceiving practices." Opp'n 11-14. Both cases are clearly distinguishable. In *Flynn*, several legal risk disclosures were made **after** a regulatory agency had suspended a supplier's license for failure to comply with manufacturing regulations. *Flynn*, 2016 WL 3360676 at *10-11. Similarly, the court in *BioScrip* found defendants' risk disclosures (*e.g.*, "from time to time, the Company responds to subpoenas and requests for information from Governmental agencies") to be misleading because the company "was already in receipt of just such a request for information," which it did not reveal until nearly a year after it was served by the Government. *BioScrip*, 95 F.

27

Supp. 3d at 727. Unlike the companies in *BioScrip* and *Flyn*—that failed to disclose existing regulatory scrutiny when speaking about regulatory risks—LendingClub accurately disclosed its state of affairs during the Class Period: (1) that it was subject to FTC regulations, (2) that it may be in violation of those regulations, and (3) that it was being investigated by the FTC.

### 3. Statements regarding LendingClub's "no hidden fees"

Finally, the CAC alleges that the statements touting LendingClub's "no hidden fees" (*e.g.*, CAC ¶ 95), "fixed rate(s) that [are] clearly disclosed" (*e.g.*, *id.* ¶ 109), and "transparency" (*e.g.*, *id.* ¶¶ 95; 109) are false. The statements at issue are: (1) in its 2016 10-K filings with the SEC, under the 'Transparency and Fairness' heading, LendingClub stated "The installment loans offered through our marketplace feature a ***fixed rate*** that is ***clearly disclosed*** to the borrower during the application process, with fixed monthly payments, ***no hidden fees*** and the ability to prepay the balance at any time without penalty" (CAC ¶ 95) and (2) in its 2017 10-K filings with the SEC under the "Transparency" heading, LendingClub stated "The installment loans facilitated through our lending marketplace feature a ***fixed rate*** that is ***clearly disclosed*** to the borrower during the application process, with fixed monthly payments, ***an origination fee*** and the ability to prepay the balance at any time without penalty (*id.* ¶ 109). (emphasis added).

Plaintiffs argue that "Defendants falsely told investors that [LendingClub] does not charge an origination fee or a prepayment penalty, that its fixed rates are 'clearly disclosed to the borrower during the application process,' and there are 'no hidden fees.'" Opp'n at 6 (citing CAC ¶¶ 95-96, 109). According to Plaintiffs, LendingClub "did in fact charge hidden fees in the form of an origination fee that was not 'clearly disclosed' to borrowers; a practice that was anything but transparent." Opp'n at 6-7. As an initial matter, as discussed above, touting the Company's "transparency" is non-actionable puffing. Moreover, a large portion of Plaintiffs' arguments are not based in facts alleged in the CAC. First, the Court notes that Plaintiffs have withdrawn allegations that LendingClub falsely represented that it charges "no origination fees" because those statements were made in the context of LendingClub's auto refinance products, which in fact, do not charge an

origination fee.  *See* ECF 88 at 30:6-9.  Second, there are no allegations in the CAC regarding a "prepayment penalty" and thus, the Court disregards Plaintiffs' argument on this issue.  Third, these statements represent that LendingClub's loans feature a fixed ***rate*** (and not a fixed ***fee***) that is clearly disclosed.  The CAC does not allege that LendingClub's interest rates were "hidden" – only that LendingClub charged "hidden" origination fees.

That leaves Plaintiffs with one statement, made on February 28, 2017, that touts LendingClub's "no hidden fees."  CAC ¶ 95.  To demonstrate the falsity of this statement, Plaintiffs first rely on CW statements.  CW1 stated that "the only place the one-time fee was mentioned was far down the page and in very small print."  CAC ¶ 43.  According to CW1, "the Company routinely trained and managed its support representatives to ensure consumer confusion" and that "management instructed representatives not to read truth-in-lending disclosures to consumers."  *Id.* ¶ 44.  CW2 stated that the Company "received numerous consumer complaints about the origination fees" and participated in regular meetings with Senior Vice President of Operations Darin Cline, "in which member support staff voiced concerns about the constant stream of calls from borrowers expressing confusion after receiving loan proceeds less than they expected."  *Id.* ¶ 50.  CW3 "took about 200 calls each day from borrowers, approximately one quarter to one third of those calls from borrowers upset after receiving materially less loan proceeds than they expected."  *Id.* ¶ 51.

Plaintiffs could have established falsity in at least one of three ways: "(1) the statement [was] not actually believed, (2) there [was] no reasonable basis for the belief, or (3) the speaker [was] aware of undisclosed facts tending seriously to undermine the statement's accuracy."  *Align Tech., Inc.*, 856 F.3d at 616.  But the CAC fails to do so, because there are no allegations, whatsoever, as to what each speaker knew at the time any of the statements were made.  Accepting the CW statements as true at this pleading stage, all they establish is that (1) a significant number of LendingClub customers complained that the Company charged "hidden fees" and (2) some members of LendingClub management were aware of these customer complaints.  *See* Opp'n at 8 (CWs "implicated the direct involvement of [LendingClub] senior management in the deceptive

29

lending practices, which strongly support allegations of a systemic Company practice."). But generally implicating "senior management" is not enough to establish falsity under PSLRA. The best CAC offers is a conclusory statement from CW1 that "given the general awareness within the Company of the hidden fee problem and Sanborn's hands-on management style, Sanborn and other top management were aware that the Company was misleading potential borrowers about the hidden origination fees." CAC ¶ 45. It is clear from CW1's statement that CW1 does not have any personal knowledge as to what Mr. Sanborn actually knew (and when). Plaintiffs have failed to satisfy the PLSRA and Rule 9(b) pleading requirements, because the CAC does not establish that the alleged facts "were known to Defendants *at the time the statements were made.*" *Norfolk Cty. Ret. Sys.*, 2016 WL 7475555, at *3.

The CAC also adopts certain factual allegations from the FTC Complaint—which, Plaintiffs argue, are further evidence of lack of "transparency" in LendingClub's loan practices. *See* Opp'n at 10-11 (citing FTC Complaint ¶¶ 26, 33). For example, Plaintiffs argue, relying on the FTC Complaint, that "Defendants knew or recklessly disregarded the prevalence of [the unauthorized bank withdrawal]" because "the Company's own internal monthly complaint reporting reflected a growing number of complaints." Opp'n at 11; CAC ¶ 67. Even if LendingClub's touting of its "transparency" was actionable—which it is not as discussed above—Plaintiffs' reliance on the FTC allegations is misplaced.

First, Plaintiffs may not allege "facts" simply because they appear in FTC's Complaint. *See* CAC ¶¶ 8; 65; 66; 67 ("According to the FTC, …"). Being accused of wrongdoing is not basis for securities fraud. Moreover, Plaintiffs may not rely on a third party's investigation to satisfy their Rule 11 obligations. Fed. R. Civ. P. 11 (representations in pleading must be "formed after an inquiry reasonable under the circumstances."). Plaintiffs claim that Defendants have admitted to some of the facts in the FTC Complaint. *See* Opp'n at 1; 3; 5; 11; 12. That may be so, but such admissions are not pled in the CAC.

Plaintiffs argue that the CAC's reliance on the FTC allegations is proper because, "Plaintiffs

incorporate allegations from the FTC complaint to corroborate CW statements." Opp'n at 9 (citing to *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019) (declining to "deeply discount or decline to consider altogether" specific factual allegations from a government complaint provided to corroborate similar factual allegations in plaintiff's complaint)). Plaintiffs' argument may hold water as to the allegations of "hidden fees" (which fail for other reasons as discussed above) because the CWs provide testimony related to similar facts. In contrast, Plaintiffs have provided no corroboration whatsoever for any of the other allegations in the FTC Action (*e.g.*, unauthorized bank withdrawals, privacy policy violations, or loan approval process). Plaintiffs may not rely on facts alleged in the FTC Action without providing any independent corroboration.

Second, as discussed above, the FTC Complaint was filed ***after*** the challenged statements were made—and the alleged "admissions" even after that. Plaintiffs fail to acknowledge that FTC allegations (even if proven) do not automatically become basis for securities fraud—Plaintiffs must plead specific facts indicating why ***each statement*** at issue was false. *Metzler Inv. GMBH*, 540 F.3d at 1070. Plaintiffs argue that the "gravamen of the CAC" is that LendingClub deceived "*borrowers*." Opp'n at 1 (emphasis in original). That maybe so, but for the CAC to pass muster in this securities fraud action, Plaintiffs must allege that ***investors*** were misled.

The Court concludes that Plaintiffs failed to plead falsity as to any of the alleged misstatements in the CAC.

### iii. Scienter

Defendants next challenge the sufficiency of the allegations with respect to scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted). A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter. *See* 15 U.S.C. § 78u–4(b)(2)(A); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014). A court should deny a motion to dismiss "only if a reasonable person would deem the inference of scienter

31

cogent and at least as compelling as any opposing inference one could draw from the facts alleged" in the complaint. *See Tellabs*, 551 U.S. at 324. Plaintiffs must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference." *Id.* at 323.

To demonstrate scienter, defendants must have contemporaneously made "false or misleading statements either intentionally or with deliberate recklessness." *See Zucco Partners*, 552 F.3d at 991 (internal quotation marks omitted). "[M]ere recklessness or a motive to commit fraud and opportunity to do so" is not enough. *Reese*, 747 F.3d at 569. Rather, a plaintiff must show "a highly unreasonable omission" and "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *See Zucco Partners*, 552 F.3d at 991 (internal quotation omitted). Courts must "assess all the allegations holistically," not "scrutinize each allegation in isolation." *Tellabs*, 551 U.S. at 326.

Plaintiffs rely on the following to support an inference of scienter: (1) the CW allegations regarding "hidden fees," (2) omission of the "hidden fee" language from LendingClub's 2017 10-K filing, (3) facts alleged in the FTC Action regarding an internal compliance review and an investor's warnings regarding "hidden fees," and (4) Core Operations doctrine. *See* Opp'n at 17-24. As an initial matter, the Court notes that none of Plaintiffs' alleged indicia of scienter relate to the allegations of non-compliance with the GLBA. Specifically, there are no allegations in the CAC or Plaintiffs' opposition brief that any of the Individual Defendants, or LendingClub, knew that LendingClub's privacy policy was not compliant with the GLBA **before** the FTC Action was filed.

### a. Confidential Witnesses

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of

32

scienter." *Zucco Partners*, 552 F.3d at 995 (citations omitted).

As an initial matter, the Court notes that the CWs' statements are limited to the issue of allegedly "hidden fees." Plaintiffs offer statements by three CWs to show that Individual Defendants knew of or deliberately disregarded the falsity of their statements at the time they were made. *See* CAC ¶¶ 43-55. CW1 and CW3 were member support representatives and CW2 started as a member support representative and moved on to a senior credit specialist. *Id.* ¶¶ 43; 50; 51. Plaintiffs argue that CW1 and CW2 had "personal knowledge" that customer support representatives were "fielding a material number of customer complaints concerning the hidden nature of the fees, and regarding borrowers receiving less money than they had contracted for." Opp'n 18.

CWs provide statements regarding customer complaints and describe how LendingClub trained its employees to handle those complaints. For example, CW2 stated that "the Company received numerous consumer complaints about the origination fees." CAC ¶ 50. CW3 took about 200 calls each day from borrowers, approximately one quarter to one third of those calls from borrowers upset after receiving materially less loan proceeds than they expected. *Id.* ¶ 51. According to CW3, many borrowers failed to notice the "fee disclosure language," located "farther down the form and in several sizes smaller type than the other information." *Id.* ¶ 52. CW1 stated that LendingClub "routinely trained and managed its support representatives to ensure consumer confusion." *Id.* ¶ 44. For example, according to CW1, the Company "timed each support call, and managers directed support representatives to devote no more than four minutes and thirty seconds to each call, an insufficient time to answer potential borrowers' questions about the loan process." *Id.* CW3 also stated that "management trained member support representatives specifically to deal with consumers upset about the hidden origination fee" and "to direct borrowers to where the Company had disclosed the origination fee during the loan process." *Id.* ¶ 54.

The Court is persuaded that Plaintiffs have sufficiently alleged that the CWs were in positions to have personal knowledge of LendingClub's customer complaints about "hidden fees." However, the CWs' personal knowledge ends there. None of the CWs had any direct (or indirect)

33

contact with any of the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of mind. *See Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, No. 17-16895, 2019 WL 3020946, at *2 (9th Cir. July 10, 2019) ("Under the PSLRA, a complaint must state with particularity facts giving rise to a strong inference that each defendant acted with scienter."). In fact, the CAC lacks any allegations as to the state of mind of any of the Individual Defendants. *See Welgus*, 2017 WL 6466264, at *22 (finding no scienter where "there are no allegations regarding Defendants' state of mind").

Plaintiffs argue that "the CAC adequately alleges that [LendingClub] executives were hands-on and well-informed concerning the material number of complaints from customers about [LendingClub's] hidden fees, and were active in training [LendingClub's] employees to further confuse customers." Opp'n at 21 (citing CAC ¶¶44, 45, 54). Plaintiffs' argument can most generously be viewed as a gross exaggeration of the allegation in the CAC. CW1 (a member support representative), without claiming any personal knowledge of what any of LendingClub's executives actually knew, made the following conclusory statements (1) "the Company's management knew that support representatives were not adequately informing consumers about the loan process and hidden fees," (2) "Company's managers, including CW1's direct supervisors and Company executives, including Defendant Sanborn, were aware of the confusion consumers faced," and (3) "given the general awareness within the Company of the hidden fee problem and Sanborn's hands-on management style, Sanborn and other top management were aware that the Company was misleading potential borrowers about the hidden origination fees." CAC ¶¶44, 45. CW2 and CW3 do not even name any of the Individual Defendants. CW2 "participated in regular meetings" with a Senior Vice President of Operations at LendingClub—who is ***not*** an Individual Defendant—where customer complaints regarding origination fees were discussed. CAC ¶ 50. CW3 states that "management trained member support representatives specifically to deal with consumers upset about the hidden origination fee" and "to scroll through large documents with complaining borrowers, showing several lines in far smaller type that summarized the origination fee." CAC ¶

34

54.

First, scienter cannot be established based on "general awareness" and "hands-on management style" or by lumping "management" and "executives" together. *See Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 681–82 (9th Cir. 2005) ("The allegation that [a fact] was 'common knowledge' … does not comport with the PSLRA's requirement that plaintiffs allege the required state of mind as to each Defendant who made an allegedly misleading statement and is therefore insufficient."). The CAC does not identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made. In short, Plaintiffs fails to allege ***when*** and ***how*** any of the Individual Defendants became aware of any facts giving rise to inference of scienter.

Second, Plaintiffs' bald allegations as to Sanborn's knowledge fare no better. *See Zucco Partners*, 552 F.3d at 998 (finding "generalized claims about corporate knowledge" such as "[defendant] had to have known" or "project managers *knew*" are not sufficient to create a strong inference of scienter, because "they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state."). Specifically, scienter is not properly alleged when the CW statements are insufficiently particular to establish the CWs' personal knowledge of the Individual Defendants' state of mind, and "relate to events too far removed from the alleged misrepresentation to be indicative of scienter." *Align Tech.*, 65 F. Supp. 3d 859 n. 8 (citing *Zucco Partners*, 552 F.3d at 995). CW1's vague and conclusory references are not sufficient to establish that she (or he) was in a position to provide reliable information about Sanborn's state of mind. In short, "merely speculative" awareness of Individual Defendants' knowledge is not enough. *Bao v. Solarcity Corp.*, No. 14-CV-01435-BLF, 2016 WL 4192177, at *11 (N.D. Cal. Aug. 9, 2016), *aff'd sub nom. Webb v. Solarcity Corp.*, 884 F.3d 844 (9th Cir. 2018).

The cases that Plaintiffs cite are inapposite. The *City of Miami* plaintiffs "proffer[ed] testimony of CWs who indicate[d] that [Individual Defendants] ***had access to*** and ***reviewed*** reports which described the [the company's] inventory shortage and customer complaints." *City of Miami*

35

*Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1043 (N.D. Cal. 2018) (emphasis added). The CAC, however, fails to connect any of the Individual Defendants to the customer complaints. In *MannKind*, plaintiffs alleged that defendants had access to various information (contradicting their public representations) from their interactions with the U.S. Food and Drug Administration—which were "absolutely integral to the company's success." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814-815 (C.D. Cal. 2011). Here, Plaintiffs have not alleged that any of the Individual Defendants had access of any kind to the customer complaints— let alone through a forum "integral to the company's success." Finally, in *Hatamian* a CW (one of the individual defendants' direct report) stated that the individual defendants were "kept apprised of" and "intimately involved" in production issues and "attended weekly production meetings." *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162-63 (N.D. Cal. 2015). Here, the CWs have claimed no direct (or indirect) contact with any of the Individual Defendants.

The Court notes that CWs also make contradictory statements. According to CW1 "[customer] representatives never explicitly let consumers know about the origination fee – it was up to the consumers to find and read it" and "management instructed representatives not to read truth-in-lending disclosures to consumers." CAC ¶ 44. CW3, on the other hand, stated that "the Company trained all member support representatives to direct borrowers to where the Company had disclosed the origination fee during the loan process" and "to scroll through large documents with complaining borrowers, showing several lines in far smaller type that summarized the origination fee." *Id.* ¶ 54. In any event, without more, customer complaints do not give rise to a strong inference of scienter. *Curry v. Yelp Inc.*, No. 14-CV-03547-JST, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015)) ("[C]ustomer complaints generally do not, on their own, establish the veracity of the allegations contained therein and the falsity of a defendant's representations to the contrary."); *Extreme Networks*, 2017 WL 1508991, at *20 ("[R]ecount[ing] the negative impact on customers is insufficient to establish scienter—it more properly sounds in corporate mismanagement.")

36

### b. Omission of the "Hidden Fee" Language

Plaintiffs allege that LendingClub's decision to omit the "no hidden fees" language in the 2017 10-K is further evidence of scienter because the 2016 10-K and other earlier filings touted "no hidden fees" and therefore, "the sudden, subtle change shows consciousness of the deceptive nature of [LendingClub's] prior statements." Opp'n at 19; *see also* CAC ¶ 109. Unsurprisingly, Plaintiffs do not cite to any authority to support this theory. As this Court has explained, "if the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, no public company would ever remove disclosures from its filings." *Welgus*, 2017 WL 6466264, at *8. Omission of "no hidden fees" language in LendingClub's 2017 10-K cannot establish falsity—let alone scienter.

### c. Facts alleged in the FTC Complaint

Next, Plaintiffs rely on the allegations in the FTC action. Plaintiffs argue that "FTC's allegations corroborate those of the former employees featured in the CAC bolsters Plaintiff's allegations of scienter." Opp'n at 20-21. Citing to the FTC Complaint, Plaintiffs argue that LendingClub's "own compliance group recommended 'repeatedly' in and before 2016 that the Company change their processes to ensure compliance, demonstrating Defendants' knowledge of the Company's noncompliance." Opp'n at 22. Even assuming such internal recommendations are sufficient to establish knowledge, the allegations lack connection to any of the Individual Defendants and are not particular enough to satisfy PSLRA—for example, **when** was this "compliance review" report issued, **what** exactly did it recommend, and **whether/when** any of the Individual Defendants had access to or reviewed it. Scienter cannot be established where—as here—the CAC fails to allege that any of the Individual Defendants even read or heard of the internal reports. *Bao*, 2016 WL 4192177, at *11.

Similarly, Plaintiffs—again replying on the FTC allegations—argue that "[o]ne of Company's largest investors warned Defendants that their loan fee structure 'is not clear and conspicuous and could be subject to a UDAAP claim,' and that investor's legal counsel warned the

Company that LC's misleading ads could subject the Company to law enforcement action." Opp'n at 22-23. This allegation suffers from the same **who**/**when**/**what** deficiencies noted above and cannot establish scienter.

### d. Core Operations Inference

The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb*, 884 F.3d 844, 854. "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler Inv. GMBH*, 540 F.3d at 1068. On the other hand, "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA." *S. Ferry*, 542 F.3d at 785.

"Allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* at 785–86. "Proof under this theory is not easy." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062. A plaintiff must produce either (1) "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring," or (2) "witness accounts demonstrating that

38

executives had actual involvement in creating false reports." *Id.* (rejecting scienter under the core operations doctrine when plaintiffs pointed to "the impressions of witnesses who lacked direct access to the executives but claim that the executives were involved with [the company's] day-to-day operations" and were familiar with the contents of the certain reports).

Plaintiffs argue that the alleged misstatements are related to the "loan origination fees" that represent LendingClub's largest sources of revenue. Opp'n at 23. In Plaintiffs' view, because LendingClub is in "a heavily regulated industry" and in the wake of its prior regulatory violations, it would be "absurd" to suggest that the Company's "management was not well aware of the details of its loan processes and whether or not they were misleading customers." Opp'n at 24.

First, the Court notes that the core operation doctrine is not alleged in the CAC. *See generally,* CAC. That aside, scienter is not properly alleged under the core operations doctrine when allegations "linking specific reports and their contents to the executives" or "the link between the witnesses and the executives" are missing. *Police Ret. Sys. of St. Louis*, 759 F.3d at 1063. "Origination fees" may be one of LendingClub's main revenue sources, but that fact does not make every piece of information within the Company that relates to those fees critical to the business's core operations. It is not "absurd" to suggest that the Individual Defendants were not kept appraised of customer complaints described by the CWs or of one investor's warning, or even internal compliance review reports.

The inference is even weaker with the remaining alleged wrongdoing (*i.e.*, loan approval process, unauthorized bank withdrawals, and GLBA compliance) because all Plaintiffs have offered is second-hand allegations from the FTC Action. There is no indication that any Individual Defendant had access to or knowledge of those practices.

### e. Holistic Review

After having determined that none of Plaintiffs' allegations, standing alone, is sufficient to create a strong inference of scienter, the Court now considers the allegations holistically. *See In re VeriFone*, 704 F.3d at 702–03; *Zucco Partners*, 552 F.3d at 992. The Court finds that taken together,

39

the facts do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent. *Tellabs*, 551 U.S. at 323. Indeed, as the foregoing demonstrates, Plaintiffs' reliance on CWs, omission of "hidden fee" language, facts alleged in the FTC Action, and the core operation doctrine are unpersuasive. Particularly, the CAC fails to allege scienter as to any of the Individual Defendants. "The bar set by *Tellabs* is not easy to satisfy" because it requires Plaintiffs to plead an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Webb v. Solarcity Corp.*, 884 F.3d 844, 855 (9th Cir. 2018) (citing *Tellabs*, 551 U.S. at 324.). Plaintiffs have failed to do so.

Furthermore, there are no allegations of motive to commit fraud. The Ninth Circuit has "recognized that a lack of stock sales can detract from a scienter finding." *Webb*, 884 F.3d at 856. None of the Individual Defendants is alleged to have sold, and Sanborn and Casey purchased, LendingClub stock during the class period. ECF 68-18. Purchasing stocks during the Class Period is "significant[] for the holistic assessment" and "weighs against an inference of scienter." *Bao*, 2016 WL 54133, at *7. Furthermore, as the Defendants point out, LendingClub informed investors during the Class Period that it was being investigated by the FTC. Mot. at 25. The disclosure of the FTC investigation—related to the alleged wrongdoing—undermines the inference that Defendants acted with scienter to conceal FTC violations. Plaintiffs assert that lack of motive "is not dispositive of scienter." Opp'n at 24. That may be so, but the Court may properly consider motive as a factor in its holistic analysis of scienter.

In sum, the CAC has failed to plead facts creating a strong inference of scienter that is cogent and at least as compelling as the alternative explanation, as required by the PSLRA. Accordingly, the Court GRANTS Defendants' motion to dismiss for failure to state a claim under section 10(b) or Rule 10b-5 WITH LEAVE TO AMEND.

## B.     Claim 2 - Section 20(a)

Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564,

40

1572 (9th Cir. 1990)).  To succeed on a claim under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised "actual power or control" over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Because Plaintiffs have failed to state a claim for a primary violation of the Exchange Act, they likewise have failed to state a claim for violation of Section 20(a).  Thus, the Court GRANTS Defendants' motion to dismiss Plaintiffs' claims under section 20(a) WITH LEAVE TO AMEND.

### C.  Ms. Dolan's Motion to Dismiss

Defendant Carrie Dolan has filed a separate motion to dismiss.  Dolan Mot., ECF 69.  Dolan served as LendingClub's CFO during a short timeframe within the Class Period: May to August 2016.  CAC ¶ 22.  As a result, only a few alleged misstatements were made during Dolan's tenure. Plaintiffs did not file an opposition specifically addressing Dolan's motion to dismiss.  Instead, Plaintiffs mention Dolan in a footnote arguing that "Defendant Dolan is liable for the statements made and risk factors incorporated into the Q1 2016 10Q, in addition to her certification pursuant to Sarbanes-Oxley."  Opp'n at 16, n. 5.  Accordingly, the Court concludes that Plaintiffs have conceded that except for the statements made on May 16, 2016 (*i.e.*, (1) statements incorporated into LendingClub's 2016 10-Q and (2) Sarbanes-Oxley certification), none of the alleged misstatements are actionable as to Dolan.

Dolan makes much of the same arguments as the other Defendants but adds that "Plaintiffs do not even contend that the FTC had contacted LendingClub at the time of the alleged misstatements in May 2016."  Dolan Mot. at 8.   The Court's analysis above applies to Dolan's motion and therefore her motion is also GRANTED WITH LEAVE TO AMEND.   The Court, however, cautions that an amended complaint as to Dolan must plead facts, with particularity, as to *why* her statements were false or misleading *when made* on May 16, 2019.  Moreover, any allegation

41

of scienter must be specific to Dolan's state of mind at the time she made the statements.

## V.    ORDER

To successfully state a claim, Plaintiffs must plead with particularity what statements were made, when they were made, why they were false at the time they were made, and how the Defendant who made the statement acted with scienter at the time the statements were made. Because Plaintiffs fail to adequately plead that Defendants made any false or misleading statements and that they did so with scienter, the motions to dismiss are GRANTED WITH LEAVE TO AMEND.

Any amended complaint shall be filed **on or before December 19, 2019**. The Court requests that the chambers copy of any amended complaint be a redlined version, in color. Failure to meet the deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal of Plaintiffs' claims with prejudice.

For the amended complaint, pursuant to the PSLRA and the Federal Rules of Civil Procedure, and for the sake of clarity and efficient case management, Plaintiffs are directed to set out in chart form their securities fraud allegations under the following headings on a numbered, statement-by-statement basis: (1) the speaker(s), date(s) and medium; (2) the false and misleading statements; (3) the reasons why the statements were false and misleading when made; and (4) the facts giving rise to a strong inference of scienter. The chart may be attached to or contained in the amended complaint, but in any event will be deemed to be a part of the amended complaint.

**IT IS SO ORDERED.**

Dated: November 4, 2019

_____
BETH LABSON FREEMAN
United States District Judge

42