**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| MATTHEW VEAL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> LENDINGCLUB CORPORATION, et al., <br><br> Defendants. | Case No. 18-cv-02599-BLF <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND IN PART AND WITHOUT LEAVE TO AMEND IN PART** <br><br> [Re: ECF 96] |

This is a putative class action for securities fraud brought against LendingClub Corporation ("LendingClub" or "Company") and its officers Scott Sanborn, Bradley Coleman, and Thomas W. Casey ("Individual Defendants"), (collectively with LendingClub, "Defendants"). On November 4, 2019, the Court granted Defendants' first motion to dismiss the Consolidated Amended Class Action Complaint ("CAC", ECF 63) with leave to amend. Prior Order, ECF 92. Plaintiffs filed a timely Second Amended Complaint ("SAC") alleging that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. ECF 93. Plaintiffs also assert that Individual Defendants are liable for violations of federal securities laws as "control persons" of LendingClub, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.* Defendants now move to dismiss the SAC for failure to state a claim. Motion, ECF 96. The Court heard oral arguments on April 30, 2020 (the "Hearing"). For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED WITH LEAVE TO AMEND IN PART and WITHOUT LEAVE TO AMEND IN PART.

## I.    BACKGROUND

Defendant LendingClub is a Delaware corporation that operates an online marketplace

platform that connects borrowers and investors in the United States.  SAC ¶ 17.  Defendant Scott Sanborn ("Sanborn") was LendingClub's Acting Chief Executive Officer ("CEO") from May 6, 2016 until June 28, 2016 and has been LendingClub's CEO since June 28, 2016.  *Id.* ¶ 18.  In his tenure prior to becoming CEO, Sanborn acted as President, Chief Operating Officer, and Chief Marketing Officer.  *Id.*  Defendant Bradley Coleman ("Coleman") served as LendingClub's Principal Accounting Officer and Interim-Chief Financial Officer ("CFO") from August 2016 to September 2016.  *Id.* ¶ 19.  Defendant Thomas W. Casey ("Casey") has been the Company's CFO since September 19, 2016.  *Id.* ¶ 20.

Lead Plaintiffs, XiangHong Ding and Zhenbin Chen, bring this federal securities class action on behalf of themselves and all persons and entities other than Defendants, who purchased or otherwise acquired the publicly traded securities of Lending Club Corporation between May 9, 2016 and April 25, 2018 ("Class Period").  *See* SAC ¶ 1.  Lead Plaintiffs allege that they purchased LendingClub securities during the Class Period at "inflated prices" and were "damaged upon the revelation of the alleged corrective disclosures and/or materialization of the undisclosed risks."  *Id.* ¶¶ 15, 16.

## A.   Lending Club's Lending and Borrowing Platform

LendingClub operates as an online lending marketplace that "matches" borrowers and investors.  SAC ¶ 24.  LendingClub's borrowers apply for loans through the Company's website. *Id.* ¶ 26.  LendingClub reviews the applicants' creditworthiness and matches the borrower with a lender or lenders to fund entire loans, portions of individual loans, and/or portions of pools of loans. *Id.*  LendingClub's primary issuing bank partner, WebBank, simultaneously originates each loan and sells it to LendingClub—at a price that includes fees and interest.  *Id.*  LendingClub buys these loans with the money from its "matched" lenders, and services the loans.  *Id.*  LendingClub receives an initial origination fee and subsequent servicing fees on each payment throughout the term of the loan.  *Id.*  LendingClub records the majority of its revenue from origination fees.  *Id.* ¶ 29.

## B.   LendingClub's Pre-Class Period Internal Control Weaknesses

In May 2016, LendingClub disclosed that some of its senior executives and managers had engaged in deceptive conduct by knowingly misleading investors as to the characteristics of certain

loans.  SAC ¶ 37.  The Company stated that "material weaknesses in internal control over financial reporting" had manifested in undisclosed self-dealing, sales of non-conforming loans, backdated loan applications.  *Id.*  In response, the Company terminated those senior executives and Renaud Laplanche (LendingClub's founder, Chairman, and CEO).  *Id.*  On May 17, 2016, the Company disclosed the circumstances related to the internal control weaknesses and summarized a "board review" of those circumstances, including certain findings (the "Board Review").  *Id.* ¶ 41.  The Company also disclosed that "[a]n independent sub-committee of the board supervised a review 'with the assistance of independent counsel and other advisors.'"  *Id.*  In addition, the Company stated that on May 9, 2019, following the announcement of the Board Review the Company received a grand jury subpoena from the U.S. Department of Justice (DOJ) and was contacted by the SEC. *Id.*

On August 9, 2016, LendingClub disclosed detailed discussion of the Board Review and the resulting changes in internal controls over financial reporting.  SAC ¶ 42.  On February 14, 2017, the Company announced that it had completed its planned remediation steps related to the material weaknesses.  *Id.* ¶¶ 114-15.

### C.    The FTC Investigation

In May 2016, the Federal Trade Commission ("FTC") contacted LendingClub and began an investigation into the Company's allegedly deceptive conduct impacting borrowers on LendingClub's platform.  SAC ¶ 4.  On November 9, 2016, LendingClub disclosed for the first time that the FTC was investigating the Company.  *Id.*  ¶ 46.  Specifically, LendingClub stated:

> On May 9, 2016, following the announcement of the board review described elsewhere in this filing, the Company received a grand jury subpoena from the U.S. Department of Justice (DOJ). The Company was also contacted by the SEC and Federal Trade Commission ("FTC").

*Id*.  The statement went on to disclose that "[t]he Company continues cooperating with the DOJ, SEC, FTC and any other governmental or regulatory authorities or agencies," and concluded that "[n]o assurance can be given as to the timing or outcome of these matters."  *Id.*

In December 2017, the FTC transmitted a draft consent order to LendingClub, proposing injunctive relief that would bring LendingClub into compliance with the FTC Act Section 5.  SAC

United States District Court
Northern District of California

¶ 49.  On February 22, 2018, LendingClub disclosed the following in its SEC annual report (Form 10-K) for the year ended December 31, 2017, disclosing information on the target of the FTC Investigation:

> On May 9, 2016, following the announcement of the Board Review, the Company received a grand jury subpoena from the U.S. Department of Justice (DOJ). The Company also received formal requests for information from the SEC and Federal Trade Commission (FTC). The FTC Staff is investigating questions concerning certain of the Company's policies and practices and related legal compliance. We have worked and continue to work to respond to the FTC's information requests, and have cooperated closely with FTC Staff as they evaluate potential claims of deception or unfairness under the FTC Act and other consumer protection laws enforced by the FTC. While we are not able to predict with certainty the timing, outcome, or consequence of this investigation, we believe that we are in compliance with all applicable federal and state laws related to this matter.
>
> The Company continues cooperating with the DOJ, SEC, FTC, and other governmental or regulatory authorities or agencies. No assurance can be given as to the timing or outcome of these matters. However, to the extent that the Company continues to incur expenses to defend or respond to these investigations, insurance policy coverage limits have been met, as described above, so that the Company will not have insurance available to offset any costs.

*Id.* ¶ 153.

On April 25, 2018, the FTC issued a press release, disclosing that it had filed a complaint against LendingClub.  SAC at 1; *see also Federal Trade Comm'n v. LendingClub Corp.*, Case 3:18-cv-02454-JSC (N.D. Cal.) ("FTC Action").  *See* Exh. A to SAC, ECF 93-1.  The complaint in the FTC Action (attached to and incorporated by reference in the SAC), alleges that LendingClub engaged in "deceptive acts" by (1) charging up-front "hidden fees" and (2) representing to borrowers that they would receive loans before making a final approval decision, resulting in some borrowers not receiving the loans they believed they were approved for.  FTC Amended Complaint ¶¶ 56-61, ECF 93-2.  FTC further alleges that LendingClub engaged in "unfair acts" by withdrawing funds from borrowers' bank accounts without authorization, or in amounts in excess of borrowers' authorization.  *Id.* ¶¶ 62-64.  Finally, FTC alleges that LendingClub violated the Gramm-Leach-Bliley Act ("GLBA") by failing to deliver initial privacy notices.  *Id.*  ¶¶ 65-67.

On the day of FTC's announcement, shares of LendingClub fell $0.49 per share, or over

15% from its previous closing price to close at $2.77 per share on April 25, 2018.  SAC ¶ 161.  By May 5, 2018, the price of LendingClub common stock was at $2.65 per share.  *Id.* ¶ 164.  Less than two weeks after the FTC Action was filed, Plaintiffs filed this lawsuit.  *See* ECF 1.  As of the date of this Order, the FTC Action remains pending.

On May 5, 2018, the Company dedicated a standalone section to the disclosure of the FTC Investigation and Action.  SAC ¶ 50.  Specifically, LendingClub stated:

> FTC Lawsuit
>
> In 2016, the Company received a formal request for information from the Federal Trade Commission (the FTC). The FTC commenced an investigation concerning certain of the Company's policies and practices and related legal compliance.
>
> On April 25, 2018, the FTC filed a lawsuit in the Northern District of California (FTC v. LendingClub Corporation, No. 3:18-cv-02454) alleging causes of action for violations of the FTC Act, including deception in connection with disclosures related to the Company's origination fees and certainty of loan approval, unfairness in making unauthorized charges to borrowers' bank accounts and violation of the Gramm-Leach-Bliley Act regarding the Company's practices in delivering its privacy notice. While the Company is not able to predict with certainty the timing, outcome, or consequence of this litigation, it believes that it has been in compliance with all applicable federal and state laws related to this matter and will vigorously defend the lawsuit.
>
> In addition, while the Company believes that the facts underlying these regulatory matters are well known and understood, as these matters are resolved the Company is subject to further claims.

*Id.*

### D.   The Court's Prior Dismissal Order

On November 4, 2019, the Court granted Defendants' motion to dismiss the CAC.  Relying heavily on the allegations in the FTC Action, the crux of the CAC was that LendingClub misled the investors by failing to disclose the alleged deceptive consumer-facing practices charged in the FTC Complaint.  *See generally*, CAC.  In its Prior Order, the Court addressed each category of the alleged false/misleading statements and (1) identified those statements that were non-actionable puffery, (2) found the remaining statements' falsity was insufficiently pled, and (3) found the CAC failed to plead facts creating a strong inference of scienter.  *See generally*, Prior Order.  The Court gave Plaintiffs leave to amend.  *See id.* at 42.

**E.     Plaintiffs' Allegations in the Second Amended Complaint**

On December 12, 2019, Plaintiffs filed the SAC, presenting a "completely different theory of liability."  Plaintiffs' Opposition to Motion ("Opp'n") at 2, ECF 101; *see also generally* SAC. Plaintiffs now allege that Defendants made false or misleading statements because (1) Defendants first failed to disclose the FTC Investigation that started in May 2016 and (2) when, in November 2016, Defendants finally disclosed that the FTC was investigating the Company, they misled the investors by lumping together all regulatory investigations, and omitting that the FTC Investigation involved wholly distinct conduct from the Board Review.  *See* SAC ¶ 4; *see also id.* ¶¶ 92-105; 106-56.

The SAC alleges that LendingClub had self-identified the issues raised by the FTC, relying on a post-Class Period statement Defendant Sanborn made during the Company's May 8, 2018 earning conference call.  *See* SAC ¶ 51. When asked "whether the issues the FTC raised were 'all about the past or is it about the present?'", Sanborn responded:

> Well, what I would say is it sounds like you saw on the [May 2018 Blog Post] is the majority of the items identified in the complaint are pointing to issues that were self-identified by the company as opportunities for improvement and self-mediated prior to any contact with the FTC or whatsoever. So, the one open item, ongoing item really relates to the disclosure of the origination fee. And again, where we believe the complaint is really factually unwarranted and that we are in compliance with the requirements there.

*Id.*  "Having self-identified in advance of the FTC investigation the very conduct that the FTC Action alleged was wrongful," Plaintiffs allege that "Defendants were duty bound not to deceive the market about the nature and thrust of the that investigation." *Id.* ¶ 8.  Accordingly, the SAC alleges that "[b]y failing to disclose the thrust of the FTC investigation—that it involved the Company's potentially deceiving borrowers, having already admitted publicly to having deceived investors—Defendants' Class Period statements about the FTC investigation and certain risks the Company faced were materially false." *Id.* Plaintiffs conclude that "[n]o question exists that [Defendants] knew of the FTC's thrust, knew of the FTC's specific concerns, and knew that the FTC investigation had nothing to do with the board review and the deception the Company had previously committed on investors." *Id.* ¶ 7.

Plaintiffs further allege that Defendants "knew" of the Company's practice of charging

1    "hidden fees" (as alleged in the FTC Action) for several additional reasons: (1) the issue was

2    identified in a December 2015 compliance review, (2) legal counsel for one of LendingClub's

3    largest investors alerted the Company that the "origination fee was inconspicuous and might subject

4    LendingClub to claims of unfair or deceptive acts and practices claim", (3) employees in the

5    compliance department warned LendingClub that its loan application processing and approval, and

6    hidden fees were likely to mislead borrowers, and (4) LendingClub admitted to tracking its

7    consumer complaints regarding hidden fees.  SAC ¶¶ 58-61.  The SAC also provides statements

8    from confidential witnesses confirming consumer confusion regarding "hidden fees."  *Id.* ¶¶ 67-79.

9    **II.     LEGAL STANDARD**

10        **A.     Rule 12(b)(6)**

11        "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

12    claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation Force*

13    *v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732

14    (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all

15    well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese*

16    *v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not

17    "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations

18    that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re*

19    *Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations

20    omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient

21    factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

22    *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A

23    claim is facially plausible when it "allows the court to draw the reasonable inference that the

24    defendant is liable for the misconduct alleged."  *Id*.

25        **B.     Rule 9(b) and the PSLRA**

26        In addition to the pleading standards discussed above, a plaintiff asserting a private securities

27    fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil

28    Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *In re*

United States District Court
Northern District of California

*VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701.  Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ...."  15 U.S.C. § 78u-4(b)(1)(B).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).  "To satisfy the requisite state of mind element, a complaint must allege that the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness."  *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original).  The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.   JUDICIAL NOTICE

While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute."  Courts have taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Defendants request that the Court take judicial notice of 23 exhibits in support of their motions to dismiss the SAC: (1) the First Amended Complaint filed by the FTC in the civil enforcement action captioned *FTC v. LendingClub Corp.*, No. 18-cv-02454-JSC (N.D. Cal.) ("FTC Action") on October 22, 2018 (Exh. A to Talarides Decl.); (2) LendingClub's Amended Answer to First Amended Complaint filed by LendingClub in the FTC Action on May 29, 2019 (Exh. B to Talarides Decl.); (3) blog entry posted on May 7, 2019 on LendingClub's website titled *LendingClub FTC Litigation Update* (Exh. C to Talarides Decl.); (4) blog entry posted on May 6,

2018 on LendingClub's website titled *LendingClub Responds to Federal Trade Commission Complaint* (Exh. D to Talarides Decl.); (5) excerpts of LendingClub's SEC filings (Exhs. E-L to Talarides Decl.); (6) press releases issued by LendingClub (Exhs. M-P to Talarides Decl.); (7) S&P's transcripts of LendingClub's earnings call (Exhs. Q-V to Talarides Decl.); and (8) LendingClub's Statements of Changes in Beneficial Ownership of Securities on Form 4, filed with the SEC on November 15, 2017 on behalf of Defendants Sanborn and Casey (Exh. W to Talarides Decl.). *See* ECF 96-1; ECF 96-2.

These documents are attached to or referenced in the complaint and/or are matters of public record. Plaintiffs do not object to Defendants' request for judicial notice. Accordingly, the Court takes notice of Exhibits A-W to Talarides's declaration at ECF 96-2. The Court does not take notice of the truth of any of the facts asserted in these documents.

## IV.    DISCUSSION

### A.    Claim 1 - Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person,

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a securities fraud claim, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017).

United States District Court
Northern District of California

### 1. Falsity

Defendants argue that the SAC, like the CAC, fails to plead that Defendants made any actionable false or misleading statements.  Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Plaintiffs must include "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).  Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action."  *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

"PSLRA imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter."  *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  In order to plead falsity, a plaintiff must plead "specific facts indicating why" the statements at issue were false.  *Metzler Inv. GMBH*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them").  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard."  *Metzler Inv. GMBH*, 540 F.3d at 1070.  An omission "refers to the failure to disclose material information about a company."  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009).  "[A]n omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information made available."  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1061 (citations and internal quotation marks omitted); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011).

Defendants challenge the viability of Plaintiffs' falsity claims, arguing that the following eight categories of statements are not adequately pled as false or misleading.

### a. Disclosures Regarding Government Investigations

During the Class Period, Defendants made several statements about government investigations into the Company.  The SAC alleges that these statements were false and misleading

10

because at first (*i.e.*, in August 2016), Defendants failed to disclose the existence of the FTC Investigation.  *See* SAC ¶¶ 98-99.  And then, after the FTC Investigation was disclosed (for the first time in November 2016), Defendants misleadingly lumped the FTC Investigation with the DOJ and SEC Investigations, omitting that the FTC investigation had nothing to do with the Board Review but rather the consumer practices at issue in the FTC Complaint.  *See* SAC ¶¶ 112-13, 122-23, 129-30, 138-39, 143-44, 153-54.

**First**, Plaintiffs allege that certain statements made in August 2016 (*before* LendingClub announced that it was under an FTC Investigation) are false and misleading because Defendants were "duty bound to disclose that the FTC had opened an inquiry."  *See e.g.,* SAC ¶ 99.  But LendingClub was not required to "make an immediate disclosure of the [FTC] investigation."  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1071 (9th Cir. 2008).  In order to be actionable, an omission must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 855 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014).  Plaintiffs fail to allege facts demonstrating that LendingClub created the impression that it was *not* under FTC scrutiny.  *See Metzler*, 540 F.3d at 1071.  Thus, no duty to disclose the investigation had arisen.

**Second,** Plaintiffs allege the following statement (repeated in several SEC filings) was false and misleading:

> On May 9, 2016, following the announcement of the board review described elsewhere in this filing, the Company received a grand jury subpoena from the U.S. Department of Justice (DOJ). The Company was also contacted by the SEC and Federal Trade Commission ("FTC").  The Company continues cooperating with the DOJ, SEC, FTC and any other governmental or regulatory authorities or agencies. No assurance can be given as to the timing or outcome of these matters.

SAC ¶¶ 112, 122, 129, 138, 143, 153.

According to Plaintiffs, this statement is misleading because Defendants lumped together all government investigation disregarding that (1) they had self-identified the issues the FTC was

United States District Court
Northern District of California

investigating and (2) the FTC investigation "had no connection whatsoever to the facts underlying the board review or to the DOJ and SEC investigations." *See* SAC ¶¶ 113, 123, 130, 139, 144, 154. In other words, Plaintiffs allege that by disclosing the FTC Investigation in a statement that starts with "following the announcement of the board review" and together with the DOJ and SEC investigations, Defendants created a misleading impression that the FTC was investigating the issues identified in the Board Review – rather than entirely unrelated consumer practices. *See id.*, *see also* Opp'n 7, 8.

Plaintiffs' allegations are insufficient because in order to make out this claim, Plaintiffs must allege facts showing that ***each Defendant*** had knowledge of the substance and target of the FTC Investigation ***at the time*** each alleged misstatement was made – and the SAC fails to set forth such factual allegations.

Plaintiffs rely on Mr. Sanborn's post-Class Period statement on May 8, 2018 (SAC ¶ 51) to establish Defendants' knowledge of the FTC Investigation. But Plaintiffs' interpretation of Mr. Sanborn's statement is not entirely accurate or helpful to their cause. In response to questions about the FTC Complaint, Mr. Sanborn stated:

> Well, what I would say is it sounds like you saw on the [May 2018 Blog Post] is the majority of the items identified in the complaint are pointing to issues that were self-identified by the company as opportunities for improvement and self-mediated prior to any contact with the FTC or whatsoever. So, the one open item, ongoing item really relates to the disclosure of the origination fee. And again, where we believe the complaint is really factually unwarranted and that we are in compliance with the requirements there.

SAC ¶ 51. Plaintiffs rely on Mr. Sanborn's statement for the notion that Defendants knew which specific consumer practices the FTC was investigating as soon as (or even before) the Company became aware of the FTC Investigation in May 2016. *See* Opp'n at 14. But, at best, Mr. Sanborn states that the majority of the practices identified in the FTC Complaint were self-identified by the Company – meaning some of the underlying consumer issues were known before May 2019, ***not*** that any of the Defendants knew the content of the FTC Investigation. Instead of providing factual allegations showing that each Defendant knew of the contents of the FTC Investigation, Plaintiffs rely on Defendants' parallel understanding of the same issues that piqued the FTC's interest. Thus,

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1   Plaintiffs conflate knowledge of the underlying consumer practices targeted by the FTC

2   Investigation with knowledge of the subject of the FTC Investigation.  In addition, Sanborn

3   specifically carves out the "hidden fees" issue (*i.e.*, "disclosure of the origination fee") from the

4   self-identified items and reiterates the Company's belief that it is in compliance.  *See* SAC ¶ 51.

5   The SAC puts a significant emphasis on the "hidden fees" issue because the origination fees are

6   alleged to be approximately 80% of LendingClub's revenue – but Sanborn's May 8, 2018 statement

7   does not establish that LendingClub had "self-identified" that particular issue.  *See* SAC ¶ 6.

8        Plaintiffs make a conclusory allegation that "[n]o question exists that [Defendants] knew of

9   the FTC's thrust, knew of the FTC's specific concerns, and knew that the FTC investigation had

10  nothing to do with the board review and the deception the Company had previously committed on

11  investors." SAC ¶ 7.  To the extent Mr. Sanborn's May 8, 2018 statement is Plaintiffs' factual basis

12  for this conclusion – that is not enough.  The SAC lacks facts establishing ***when*** Defendants learned

13  about ***what*** the FTC was investigating.

14       Similarly, Plaintiffs' reliance on the confidential witness statements, an internal compliance

15  review memo from December 2015, and an email from an investor's legal counsel, concerning the

16  adequacy of LendingClub's origination fee disclosures (*see* SAC ¶¶ 58-59) are misplaced because

17  these allegations fail to establish what each Defendant knew ***about the substance of the FTC***

18  ***Investigation*** at the time the allegedly misleading statements were made.  Thus, Defendants' motion

19  to dismiss Plaintiffs' claims related to the disclosures of government investigations (SAC ¶¶ 98,

20  112, 122, 129, 138, 143, 153) is GRANTED WITH LEAVE TO AMEND.

21            b.   Risk Factors Regarding Legal Compliance

22       Plaintiffs allege that the Company's risk warnings in its SEC filings were materially false or

23  misleading because by the time the FTC Investigation had begun, Defendants knew that those risks

24  had already materialized.  *See* SAC ¶¶ 100, 102, 104, 124, 127, 136, 141, 155.  Defendants challenge

25  these allegations of falsity because the "risk factors" the Company warned of were of risks that had

26  *not* yet materialized.  *See* Motion at 10.  For example, LendingClub warned: "non-compliance could

27  subject us to damages, revocation of required licenses, class action lawsuits, administrative

28  enforcement actions, rescission rights held by investors in securities offerings and civil and criminal

liability, which may harm our business and our ability to maintain our marketplace and may result in borrowers rescinding their loans."  SAC ¶ 104.

The Court agrees with Defendants that Plaintiffs have failed to allege the eventualities and risks LendingClub warned of (*i.e.*, the consequences of noncompliance) had materialized by the time the FTC Investigation had begun.  Plaintiffs' reliance on *Matrixx* on this issue is misplaced.  *See* Opp'n at 12 (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011)).  In *Matrixx*, the Ninth Circuit – while holistically reviewing allegations of scienter, *not* falsity – found defendants' failure to disclose a filed lawsuit in the "Risk Factors" section of SEC filings, among other facts, established scienter.  585 F.3d at 1182.  In contrast here, Plaintiffs have simply alleged that an FTC Investigation began in May 2016.  Plaintiffs do not allege facts showing that at the time of the alleged misstatements, "non-compliance" or any of the potential ramifications of non-compliance had materialized.  Thus, Defendants' motion to dismiss Plaintiffs' claims related to the disclosure of Risk Factors (SAC ¶¶ 100, 102, 104, 124, 127, 136, 141, 155) is GRANTED WITH LEAVE TO AMEND.

c.  Safe Harbor Statements

Defendants similarly challenge the allegations regarding the "Safe Harbor Statements" in two press releases and one made by non-defendant James Samford on an earnings call.  *See* Motion at 11-12 (citing SAC ¶¶ 92, 106, 108).  For example, LendingClub's August 8, 2016 press release included the following statement:

> Factors that could cause actual results to differ materially from those contemplated by these forward statements include: the outcomes of pending governmental investigations and pending or threatened litigation, which are inherently uncertain; the impact of recent management changes and the ability to continue to retain key personnel; ability to achieve cost savings from recent restructurings; the Company's ability to continue to attract and retain new and existing retail and institutional investors; competition; overall economic conditions; demand for the types of loans facilitated by the Company; default rates and those factors set forth in the section titled "Risk Factors" in the Company's most recent Quarterly Report on Form 10-Q and Annual Report on Form 10-K, each filed with the SEC.

SAC ¶ 92; *see also id.* ¶ 106 (same); ¶ 108.

Plaintiffs allege that these statements were misleading because "the threat of government

14

investigations had materialized, rendering Defendants duty bound to disclose the existence and general thrust of the FTC investigation." SAC ¶¶ 93, 107. Defendants argue that (1) there was no duty to disclose and (2) by referencing the "outcomes of pending governmental investigations" the statements make clear that the Company *was* under investigation. Motion at 12. Plaintiffs' response regarding the Safe Harbor allegations is the same as their arguments about the Risk Factors. *See* Opp'n at 11 (citing SAC ¶¶ 92, 106). Plaintiffs' Safe Harbor allegations are deficient for the same reasons that their Risk Factors allegations are, as explained above. The "outcome" of the FTC Investigation had not materialized at the time the statements were made. And the Safe Harbor statements do not create an impression that was different than the one that actually existed because they make clear that the Company was, in fact, under government scrutiny. Thus, Defendants' motion to dismiss Plaintiffs' claims related to the Safe Harbor statements (SAC ¶¶ 92, 106, 108) is GRANTED WITH LEAVE TO AMEND.

### d. Legal Expenses

Next, Defendants argue that Plaintiffs' allegations regarding statements that reference legal expenses associated with government investigations and lawsuits are deficient. Motion at 12-13 (citing SAC ¶¶ 108, 145-46, 98, 112, 122, 129, 138, 143). For example, LendingClub's 2016 10-K SEC filing included the following:

> After announcing the findings of our board review, and the significant decrease in the trading price of our common stock in May 2016, we began offering incentive retention awards to members of the executive management team and other key personnel that totaled $34.9 million and will be recognized as compensation expense ratably through May 2017. In addition, we have incurred and expect to continue to incur significant legal, professional service, and other expenses in connection with the inquiries and private litigation that have arisen and may continue to arise from the internal board review, and our response to ongoing governmental requests for information.

SAC ¶ 122. Plaintiffs allege that these statements are false and misleading because Defendants "lumped together the ongoing regulatory investigation, falsely relating each to the board review, omitting that the FTC investigation and the expenses related thereto had nothing to do with the board review[.]" SAC ¶ 123; *see also id.* ¶¶ 113, 123, 130, 139, 144.

As another example, on February 20, 2018, in the context of having settled a securities class

action lawsuit related to the Board Review, Sanborn stated:

> I do want to remind you that we are still addressing other outstanding legacy issues that will result in elevated legal costs. They are detailed in our upcoming 10-K that include litigation, ongoing government investigations from the SEC, DOJ and FTC and indemnification obligations for former employees. While it may take a few quarters for us to get these issues resolved, today's announcement is a major step forward in putting the events of 2016 behind us.
> …
> So, in terms of lawsuits, this is the federal and the state class action lawsuits, they were arising out of the 2016 disclosures.  In terms of the scale of these, we do believe that these represented our largest financial exposure.
> The remaining issues, as I indicated, are derivative lawsuit from this which is not against the company and then some ongoing government investigations with the SEC, DOJ and FTC, so obviously, difficult to predict the outcome of those with any certainty, but we are cooperating there and moving quickly to resolve those.

SAC ¶¶ 145-46.  Again, Plaintiffs allege that these statements were false and misleading because Defendants "disregarded that the FTC investigation had nothing whatsoever to do with the securities class action lawsuit the Company settled in 2018, or with the DOJ or SEC investigation that related to the board review[.]"  *Id.* ¶ 147.

Defendants challenge these allegations – to the extent that they refer to legal expenses – on the ground that the alleged reasons for their falsity has no connection to the substance of the statements themselves.  Motion at 12-13.  Plaintiffs respond that "Defendants' failure to distinguish the FTC investigation from the board review-related government investigation and to disclose that the FTC was investigating entirely distinct potential wrongdoing is inextricably linked to Defendants' misleading statements that hid the issues the FTC was investigating[.]"  Opp'n at 13.

The Court agrees with Defendants.  Even accepting *arguendo* that these statements link the government investigations together, it does not follow that statements about ongoing legal costs associated with those investigations are false or misleading.  The alleged misstatements say nothing about the substance of any of the investigations – they simply disclose that the Company has and will continue to incur costs in connection with government investigations and lawsuits.  In short, the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves.  *See Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-

1  CV-04883-BLF, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017).  Accordingly, Defendants'

2  motion to dismiss Plaintiffs' claims related to legal expenses (SAC ¶¶ 108, 145-46, 98, 112, 122,

3  129, 138, 143) is GRANTED WITH LEAVE TO AMEND.

4              e.  Opinion Statements

5      The SAC alleges that two statements, touting the Company's "transparency" are false and

6  misleading.  *See* SAC ¶¶ 118, 149.  LendingClub's 2016 10-K SEC filing included the following:

> **Transparency and Fairness**. The installment loans offered through
> our marketplace feature a fixed rate that is clearly disclosed to the
> borrower during the application process, with fixed monthly
> payments, no hidden fees and the ability to prepay the balance at any
> time without penalty. Small business lines of credit have rates based
> upon the prime rate and allow borrowers to draw in increments,
> reducing their interest cost. Our platform utilizes an automated, rules-
> based engine for credit decisioning, which removes the human bias
> associated with reviewing applications.

12  SAC ¶ 118.  Plaintiffs allege that this statement is false and misleading because Defendants omitted

13  that (1) they "had already 'self-identified' [the Company's] practices with respect to hidden fees"

14  and (2) the FTC was investigating, among others, hidden origination fee disclosures.  *Id.* ¶ 119.

15      Defendants challenge this allegation because the SAC fails to bring forth factual allegations

16  as to **what** each Defendant knew and **when**, about whether LendingClub's origination fee was

17  properly disclosed to consumers (*i.e.*, "hidden" fees issue) or whether the FTC Investigation targeted

18  the disclosure of those fees.  Motion at 14-15.  Plaintiffs respond that Defendants' "self-

19  identification and self-mediation of the issues the FTC began investigating" means that (1)

20  Defendants knew of adverse facts that seriously undermined the accuracy of their opinion about the

21  Company's "transparency and fairness" and (2) that they did not actually believe it.  Opp'n at 14

22  (citing SAC ¶ 51, 60).  Defendants reply that "Plaintiffs' new theory of fraud—that Defendants lied

23  about the FTC investigation—has no connection to the substance of the statements."  Reply at 8,

24  ECF 102.

25      In the Ninth Circuit, there are three different standards for pleading falsity of opinion

26  statements: (1) "when a plaintiff relies on a theory of material misrepresentation, the plaintiff must

27  allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively

28  untrue, (2) "when a plaintiff relies on a theory that a statement of fact contained within an opinion

United States District Court
Northern District of California

17

statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue" or (3) "when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the basis for the issuer's opinion whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (citation omitted).

*First*, as Defendants note, the Court has determined that touting the company's "transparency and fairness" is non-actionable puffery because such statements are not capable of objective verification.  *See* Motion at 14; Prior Order at 20, 28.  *Second*, the Court agrees with Defendants that Plaintiffs' new theory of liability (*i.e.*, Defendants' alleged failure to disclose the existence and substance of the FTC Investigation) is entirely untethered to this opinion statement and "hidden fees."  *See* Opp'n at 2 (disclaiming the CAC's theory of liability that "Defendants actually committed the violations alleged in the FTC Complaint").  In other words, even if Defendants had identified the underlying "hidden fees" issue as a potential problem for consumers, it does not follow that they also misled the investors about the FTC Investigation.  This statement has no relation to the FTC Investigation.  *Third*, to the extent that Plaintiffs allege this statement is false or misleading because LendingClub did charge "hidden fees," the SAC, like the CAC, fails to allege facts about what each Defendant knew and when about potential issues with the Company's origination fees.  The same analysis applies to the opinion statement in LendingClub's 2017 10-K submission (*see* SAC ¶¶ 149-50), which does not even include the "no hidden fees" language and is entirely unrelated to the FTC Investigation.  Accordingly, Defendants' motion to dismiss Plaintiffs' claims related to the opinion statements at SAC ¶ 118 and SAC ¶ 149 is GRANTED WITH LEAVE TO AMEND.

### f.  Privacy Policy

Plaintiffs challenge the following statement in LendingClub's 10-Ks filed on February 28, 2017 and February 22, 2018: "We have a detailed privacy policy, which complies with GLBA[.]" SAC ¶¶ 120, 151.  Plaintiffs allege these statements were false and misleading because "Defendants knew or recklessly disregarded that they had 'self-identified' Gramm-Leach-Bliley compliance as a

18

material issue, even prior to the FTC's beginning its inquiry in May 2016." *Id.* ¶¶ 121, 152.  As the Court noted in its Prior Order, the FTC's allegations regarding LendingClub's privacy policy are limited to conduct that ended in 2016 – providing no support that the 2017 and 2018 statements were false.   Prior Order at 26 (citing FTC Complaint ¶¶ 51; 52).   Now, Plaintiffs make the unintelligible argument that "[e]ven if [Defendants] had cured the GLBA deficiencies, Defendants knew that the FTC was investigating GLBA violations at the time the alleged false statements were made, ¶¶ 7, 51, 66, and thus liability for those past practices was still possible."  Opp'n at 15.  There are no allegations in the SAC to demonstrate that LendingClub's privacy policy was (or that Defendants believed it to be) noncompliant with the GLBA as of February 28, 2017 and February 22, 2018 – when the alleged misstatement were made.  Accordingly, Plaintiffs' allegations regarding these statements are deficient because they do not include facts showing why the statements were false when made.  Defendants' motion to dismiss Plaintiffs' claims related to LendingClub's Privacy Policy (SAC ¶¶ 120, 151) is GRANTED WITH LEAVE TO AMEND.

### g.   Non-Actionable Statements and Omissions

Defendants challenge two statements as non-actionable puffery – relying on the Prior Order. *See* Motion at 16.  A material misrepresentation differs significantly from corporate puffery.  Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact.  *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (finding that puffery includes statements "not capable of objective verification").  Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Finally, "mildly optimistic, subjective assessment[s] . . . [do not] amount[ ] to a securities violation." *Id*.

**First**, Defendants point to Sanborn's August 8, 2016 statement in which he discussed the Company's "comprehensive review of [its] controls, compliance, and governance."  Motion at 16 (citing SAC ¶ 94).   While certain portions of this statement remain non-actionable even under Plaintiffs' new theory of liability (*e.g.*, "Our long-term success is dependent on coupling our technology and business model advantages with a relentless focus on compliance, security and risk

management."), other portions of the statement are factual and cannot be categorized as non-actionable puffery.  For example, Mr. Sanborn stated: "Beyond our internal focus, we remain proactive with regulators, policy makers and consumer advocacy groups."  SAC ¶ 94.  Plaintiffs contend that this statement is misleading because "[o]nce Defendants chose to speak about their 'proactive' approach with regulators, they became duty bound to disclose that the FTC had opened an inquiry, unrelated to the board review[.]"  SAC ¶ 95.  Accordingly, while the Court declines to dismiss the entire statement as non-actionable puffery, Mr. Sanborn's statement regarding the Company's "relentless focus on compliance, security and risk management" is DISMISSED WITHOUT LEAVE TO AMEND.

   ***Second***, Defendants challenge Mr. Casey's February 14, 2017 statement:

> [B]anks returning to the platform has been a priority for us ***and acts as an endorsement of our strength in compliance and controls***. As Scott mentioned, we have all the key banks back on the platform that purchased between January and April and added five more last quarter. Just as banks are an indication of our strong internal processes, ***I am pleased to report that during the quarter we are able to complete the planned remediation steps related to the material weakness***. (Emphasis added).

*See* Motion at 16 (citing SAC ¶ 115).  In its Prior Order, the Court dismissed the first sentence of this statement as non-actionable puffery because the statement is not capable of objective verification.  Prior Order at 18, 20.  That analysis does not change with Plaintiffs' new theory.  Thus, the first sentence of this statement (SAC ¶ 115) is DISMISSED WITHOUT LEAVE TO AMEND.

   h.  Statements Unrelated to Practices at Issue

   In its Prior Order, the Court dismissed some of the alleged misstatements because they lacked connection to the reasons Plaintiffs provided for their falsity.  *See* Prior Order at 22-25. Defendants now argue that the following statements are again unrelated to the allegations of falsity in the SAC: (1) statements about LendingClub's redesigned website and "new strategy and technology for verifying income and employment (SAC ¶¶ 131, 133), (2) LendingClub's remediation steps related to the Company's 2016 material weaknesses (SAC ¶¶ 114, 115), and (3) SOX certifications (SAC ¶¶ 97, 111, 117, 126, 135, 140, 148).

   The Court agrees with Defendants.  For the same reasons the Court found that these

United States District Court
Northern District of California

statements were unrelated to the underlying consumer practices at issue in the FTC Investigation, they are also unrelated to FTC Investigation itself, which is the basis for Plaintiffs' new theory of liability.   The FTC Investigation and the underlying practices it targeted have no connection to LendingClub's redesigned website, the Company's financials, or the 2016 Internal Control Weaknesses related to internal controls over financial reporting.   Because Plaintiffs have had the opportunity to and failed to cure their allegations as to these statements, the Court DISMISSES Plaintiffs allegations in SAC ¶¶ 131, 133, 114, 115, 97, 111, 117, 126, 135, 140, 148 WITHOUT LEAVE TO AMEND.

### 2.   Scienter

Defendants also challenge the sufficiency of the allegations with respect to scienter.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted).  A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter.  *See* 15 U.S.C. § 78u–4(b)(2)(A); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014).  A court should deny a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" in the complaint.  *See Tellabs*, 551 U.S. at 324.  Plaintiffs must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference." *Id.* at 323.

To demonstrate scienter, defendants must have contemporaneously made "false or misleading statements either intentionally or with deliberate recklessness." *See Zucco Partners*, 552 F.3d at 991 (internal quotation marks omitted).  "[M]ere recklessness or a motive to commit fraud and opportunity to do so" is not enough.  *Reese*, 747 F.3d at 569.  Rather, a plaintiff must show "a highly unreasonable omission" and "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *See Zucco Partners*, 552 F.3d at 991 (internal quotation omitted).  Courts must "assess all the allegations holistically," not "scrutinize each allegation in isolation." *Tellabs*, 551 U.S. at 326.

Plaintiffs rely on the following to support an inference of scienter: (1) LendingClub's self-

identification of the majority of the issues in the FTC Action, (2) LendingClub's "hiding" of the focus of the FTC Investigation, (3) warnings from an internal compliance review and one of the Company's largest investors, (4) confidential witnesses, and (5) Core Operations doctrine.  *See* Opp'n at 15-25.   Plaintiffs' scienter allegations fail for several reasons.

> a.   Plaintiffs' Factual Allegations of Scienter

The SAC, like the CAC, lacks sufficient factual allegations to establish scienter as to each Defendant.

***First***, many of the alleged facts Plaintiffs rely on to establish scienter do not support Plaintiffs' new theory of liability.  The gist of the SAC is that Defendants misled investors by omitting the existence and the focus of the FTC Investigation.  Importantly, in the SAC, Plaintiffs abandon their original theory that Defendants misled investors about the allegedly unlawful *consumer practices* that are the subject of the FTC Action.  *See* Opp'n at 2.  Thus, it follows that Plaintiffs' allegations of scienter in the SAC must include facts to establish ***what*** each Defendant knew about the FTC Investigation, the specific issues the FTC was investigating, and ***when*** each Defendant became aware of those details.  Instead, many of Plaintiffs' factual allegations remain focused on Defendants' (impermissibly lumped together) knowledge of the underlying consumer practices.  For example, none of the Confidential Witnesses is alleged to have had any knowledge of the FTC Investigation.  Similarly, allegations of internal compliance review and warnings from one of the Company's largest investors are related to the underlying consumers practices – not the FTC Investigation – and therefore do not support an inference of scienter.  In other words, even if Defendants knew of the underlying practices the FTC was investigating (*e.g.*, hidden fees), it does not follow that they also knew that the FTC was investigating those practices.  And as the Court explained in its Prior Order, Plaintiffs' allegations are insufficient to allege scienter even as to the consumer practices at issue because they do not establish the state of mind of each Defendants.

***Second***, none of Plaintiffs' factual allegations support the conclusion that Defendants were aware of the specific targets of the FTC Investigation.  Plaintiffs argue that Defendants knew about the specific issues the FTC was investigating because (1) Defendant Sanborn admitted that Defendants had been cooperating with the FTC since it began its investigation and (2) the Company

1    had self-identified the practices charged in the FTC Complaint.  Opp'n at 16-17.  Plaintiffs contend

2    that "[t]he plausible inference that Defendants knew what the FTC was investigating as of May

3    2016, *see* ¶ 51, must be credited."  Opp'n at 17.  But to plead scienter under PSLRA, inference of

4    scienter must be "cogent and at least as compelling as any opposing inference one could draw from

5    the facts alleged."  *Tellabs*, 551 U.S. at 324.  LendingClub's general cooperation with the FTC

6    Investigation does not lead to an inference of scienter (*i.e.*, that ***each Defendant*** knew about the

7    specifics of the FTC Investigation as early as May 2016 and intentionally or with deliberate

8    recklessness omitted their disclosure) that is "cogent and at least as compelling" as the opposing

9    inference of nonfraudulent intent.  *See id.*  And Sanborn's statement (made after the FTC Complaint

10   was filed) regarding the Company's self-identification of the issues in the FTC Complaint goes to

11   the Company's knowledge of the underlying consumer practices (with the exception of the alleged

12   hidden fees) – and not anyone's knowledge as to the substance of the FTC Investigation ***at the time***

13   the alleged misleading statements were made.

14       **Third**, Plaintiffs' argument that their allegations of falsity are sufficient to plead scienter is

15   unpersuasive.  *See* Opp'n at 18. "[F]alsity may itself be indicative of scienter where it is combined

16   with allegations regarding a management's role in the company that are particular and suggest that

17   the defendant had actual access to the disputed information, and where the nature of the relevant

18   fact is of such prominence that it would be absurd to suggest that management was without

19   knowledge of the matter."  *Zucco*, 552 F.3d at 1000.  Here, the SAC lacks any "particular"

20   allegations regarding each Defendant's "actual" access to the substance of the FTC Investigation at

21   the time the alleged statements were made.

22       And Plaintiffs' cited authority are clearly distinguishable.  In *Evanston*, individual

23   defendants "touted intimate knowledge of generic drug manufacturers, generic drug pricing, and

24   challenges that might impede supply" but still went on "to falsely attribute generic drug price

25   increases to non-existent supply disruptions."  *Evanston Police Pension Fund v. McKesson Corp.*,

26   411 F. Supp. 3d 580, 602 (N.D. Cal. 2019).  Individual Defendants in this case are not alleged to

27   have either touted their knowledge of the FTC Investigation, or made any blatantly false statements.

28   Similarly, in *Karinski*, defendants were alleged to have regularly referenced conversations they had

United States District Court
Northern District of California

23

with a third-party regarding their partnership and misrepresented that relationship as a "very happy" partnership, while being aware that the third-party was not happy. *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKX), 2020 WL 281716, at *15 (C.D. Cal. Jan. 17, 2020). The defendants in *CV Sciences*, conceded that they had knowledge of patent rejections (pending appeal) when they made statements that their product was "patent-pending," "patent-protectable," and "proprietary." *In re CV Scis., Inc. Sec. Litig.*, No. 218CV01602JADBNW, 2019 WL 6718086, at *5 (D. Nev. Dec. 10, 2019). No such concession is made in this case.

**Fourth**, even if Defendants knew what practices the FTC was investigating, Plaintiffs' allegations fail to establish each Defendant's state of mind. Plaintiffs do not argue that any of the statements were false on their face – only that Defendants omitted at first the existence of an FTC investigation, and later the specific targets of that investigation. To sufficiently plead scienter for allegedly misleading omissions, however, Plaintiffs must allege "a highly unreasonable omission" and facts to support the inference that Defendants either knew that their omissions were misleading the investors or that the potential for misleading the public was so obvious that Defendants must have been aware of it. *See Zucco Partners*, 552 F.3d at 991. None of the facts alleged in the SAC establish the state of mind of any of the Defendants.

**Finally**, the SAC, like the CAC, lumps all Defendants together with respect to the scienter allegations. The Court warned Plaintiffs that "scienter cannot be established based on 'general awareness' and 'hands-on management style' or by lumping 'management' and 'executives together." Prior Order at 35 (citing *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 681–82 (9th Cir. 2005) ("The allegation that [a fact] was 'common knowledge' … does not comport with the PSLRA's requirement that plaintiffs allege the required state of mind as to each Defendant who made an allegedly misleading statement and is therefore insufficient.")). This is a fatal flaw in Plaintiffs' PLSRA claims.

### b. Core Operations Inference

Plaintiffs' core operation allegations also remain deficient. The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb*, 884 F.3d 844, 854. "Allegations that rely on the core-

24

operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler Inv. GMBH*, 540 F.3d at 1068.

Plaintiffs repeat the same arguments the Court rejected in the Prior Order. Plaintiffs argue that because origination fees are approximately 80% of LendingClub's revenue and important to the Company's "financial and operational success," it would be absurd to "suggest that Sanborn and [LendingClub]'s executives did not know what the FTC was investigating." Opp'n at 23. As the Court explained in its Prior Order "'Origination fees' may be one of LendingClub's main revenue sources, but that fact does not make every piece of information within the Company that relates to those fees critical to the business's core operations." Prior Order at 39. Now, Plaintiffs suggest that because (1) "origination fees are a large part of LendingClub's revenue and (2) one of the focuses on the FTC's Investigation was whether those "origination fees" are "hidden," the FTC Investigation was critical to the Company's operations. This far-fetched theory does not support a finding that this case is one of those "rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). It is not "absurd" to suggest that Defendants were not aware of the specific issues the FTC was investigating before receiving the draft FTC Consent Order in December 2017.

### c.  Holistic Review

After having determined that none of Plaintiffs' allegations, standing alone, is sufficient to create a strong inference of scienter, the Court now considers the allegations holistically. *See In re VeriFone*, 704 F.3d at 702–03; *Zucco Partners*, 552 F.3d at 992. The Court finds that taken together, the facts do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent. *Tellabs*, 551 U.S. at 323. Indeed, as noted above, Plaintiffs' factual allegations fail to sufficiently plead as to any of the Defendants.

As the Court noted in its Prior Order, there are no allegations of motive to commit fraud.

United States District Court
Northern District of California

1    *See* Prior Order at 40.  Plaintiffs fail to acknowledge that the Ninth Circuit has "recognized that a

2    lack of stock sales can detract from a scienter finding."  *Webb*, 884 F.3d at 856.  None of the

3    Individual Defendants is alleged to have sold, and Sanborn and Casey purchased, LendingClub stock

4    during the class period.  ECF 96-2, Exh. W.  Purchasing stocks during the Class Period is

5    "significant[] for the holistic assessment" and "weighs against an inference of scienter."  *Bao*, 2016

6    WL 54133, at *7.  In sum, a holistic review of the SAC demonstrated that Plaintiffs have failed to

7    plead facts creating a strong inference of scienter that is cogent and at least as compelling as the

8    alternative explanation, as required by the PSLRA.

9                                                                    ***

10       In conclusion, the Court finds that the SAC fails to plead facts creating a strong inference of

11   scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent.

12       **B.    Leave to Amend**

13       In its Prior Order, the Court warned Plaintiffs that their "failure to cure the deficiencies

14   identified in [the Prior] Order will result in a dismissal of Plaintiffs' claims with prejudice."  Prior

15   Order at 42.  Thus, Defendants move to dismiss the SAC with prejudice.  *See* Motion at 25.

16   Although the repeated failure to cure deficiencies is a proper basis for denying leave to amend, there

17   is no such repeated failure when the current motion to dismiss is "the first pleading[ ] to attack the

18   sufficiency of [Plaintiffs'] allegations, the current decision[ ] by the district court ... [is] the first to

19   address the sufficiency of those allegations, and [Plaintiffs are] seeking [their] first opportunity to

20   cure those deficiencies."  *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1183 (9th Cir.

21   2016).  Here, even though the SAC is not Plaintiffs' first attempt at curing their allegations, Plaintiffs

22   have, in the SAC, presented a new theory of liability, triggering the well-established practice in the

23   Ninth Circuit to "freely give leave" to amend a complaint.  *See Arizona Students' Ass'n v. Arizona*

24   *Bd. of Regents*, 824 F.3d 858, 871 (9th Cir. 2016) (citing Fed. R. Civ. P. 15(a)(2)).  Accordingly,

25   the Court finds that granting leave to amend is warranted.

26       **C.    Defendant Coleman**

27       The SAC fails to make any scienter allegations specific to Mr. Coleman.  *See generally* SAC.

28   At the Hearing, counsel for Plaintiffs conceded that the scienter allegations against Mr. Coleman

are limited to the Core Operations inference.  *See* Hr'g Tr. at 37:6-7, ECF 109.  Because the Court finds Plaintiffs' allegations under the Core Operations doctrine insufficient, and because the SAC added no new facts pertaining to Mr. Coleman, the Court DISMISSES Plaintiffs' claims against Mr. Coleman WITH PREJUDICE

### D.    Claim 2 - Section 20(a)

Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1572 (9th Cir. 1990)).  To succeed on a claim under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised "actual power or control" over the primary violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  The SEC has defined "control" as "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Because Plaintiffs have failed to state a claim for a primary violation of the Exchange Act, they likewise have failed to state a claim for violation of Section 20(a). Thus, the Court GRANTS Defendants' motion to dismiss Plaintiffs' claims under section 20(a) WITH LEAVE TO AMEND.

## V.    ORDER

For the foregoing reasons, Defendants' motion to dismiss at ECF 96 is:

- GRANTED WITHOUT LEAVE TO AMEND as to the allegations in SAC ¶¶ 94 (as to Mr. Sanborn's statement regarding the Company's "relentless focus on compliance, security and risk management"), 97, 111, 114, 115, 117, 126, 131, 133, 135, 140, 148.

- GRANTED WITHOUT LEAVE TO AMEND as to Defendant Coleman.

- GRANTED WITH LEAVE TO AMEND as to Defendants LendingClub, Sanborn, and Casey.

Plaintiffs' amendments are limited to curing the deficiencies identified in this Order and the Court's Prior Order.  Plaintiffs are not permitted to assert a new or revised theory of liability without leave of Court.  Any amended complaint shall be filed on or before **July 27, 2020**.  The Court

United States District Court
Northern District of California

27

requests that the chambers copy of any amended complaint be a redlined version, in color.  Failure to meet the deadline to file an amended complaint or failure to cure the deficiencies identified will result in a dismissal of Plaintiffs' claims with prejudice.

For the amended complaint, pursuant to the PSLRA and the Federal Rules of Civil Procedure, and for the sake of clarity and efficient case management, Plaintiffs are directed to set out in chart form their securities fraud allegations under the following headings on a numbered, statement-by-statement basis: (1) the speaker(s), date(s) and medium; (2) the false and/or misleading statements; (3) the reasons why the statements were false and misleading when made; and (4) the facts giving rise to a strong inference of scienter. The chart may be attached to or contained in the amended complaint, but in any event will be deemed to be a part of the amended complaint.

**IT IS SO ORDERED.**

Dated: June 12, 2020

BETH LABSON FREEMAN
United States District Judge